This is an appeal by the defendant from a judgment for the plaintiff in a declaratory judgment action. We reverse and remand.
The plaintiff, Champion Insurance Company (Champion), issued a policy of comprehensive general liability insurance to the defendant, L.J. Moss, individually and doing business as Central Roofing and Termite Company. The policy provided, among other things, the following:
 "The Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of
"A. bodily injury or
"B. property damage
 "to which this insurance applies, caused by an occurrence. . . ."
"Occurrence" is defined in the policy as "an accident including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."
During the period of time when this policy was in force the insured entered into a contract with Juanita Michael whereby the insured agreed to re-roof Mrs. Michael's house. This contract was made on or about March 16, 1982. Work began on the roof four or five days later. The work on the roof was finished about May 15, 1982. During the period between those dates, there was rain almost every day.
Mrs. Michael subsequently filed an action against Moss to recover for damage she allegedly incurred due to rain which fell into her attic and ceilings because, as she claimed, the roof was uncovered much of the time that the re-roofing job was being performed. Moss called upon Champion to defend him, and Champion filed this declaratory action, contending that it was not obligated either to defend Moss or to pay any judgment rendered against him.
The case was heard without a jury and on evidence presentedore tenus, at the *Page 27 
conclusion of which the trial court ruled in Champion's favor, concluding that Mrs. Michael's damage was not caused by an "occurrence" under the policy, because:
 "[I]t stands to reason that if a roof is removed from a house in southeast Alabama in the Spring of the year and the attic space is left partially or wholly exposed for a period of time, one can reasonably expect that house to be damaged by rain. . . ."
The issue before us is whether or not the damage complained of was caused by "an accident . . . neither expected nor intended by the insured." Moss, called as an adverse witness, testified to this issue, relating that he first had a crew of from three to four people who began the re-roofing job and worked about two weeks on it. Moss testified, "One of the reasons . . . why [that crew] worked as long as [they] did, it rained every day [they were] down there." He was asked:
 "Would it be a fair statement to say then that you could expect, because of the time of the year it was and knowing the weather conditions, that it was going to rain?"
Moss answered:
"I didn't know that. You don't ever know that here."
Moss explained that the roof was steep, composed of wood shingling, and that the crew would take off part, "dry it in," and then repeat that process. The first crew left the job, and Moss employed another crew of three who stayed a week or ten days. During this time it continued to rain, and "we couldn't go fast with it." He stated "that roof was so steep . . . I mean eight on twelve, that is a steep roof. They had to take off those boards, shingles." After about ten days, the second crew left the job, and Moss employed still another crew, who did complete the job around the middle of May. Moss went to the job every day and, in his words, it rained "all the time we worked on it."
Moss was asked, concerning the time during which the roof was being worked on, "[D]id they ever attempt to cover up Mrs. Michael's roof?" He replied that he instructed his men to dry it in with felt, and that they had done so, using fifteen pound felt building paper, the same substance "ninety-five percent of the roofing men use . . . to dry it in and then get the roof on."
He acknowledged that he learned of leakage in the roof during the time they were putting the roof on, and explained it this way:
 "Her home had a dead valley about — that dead valley is built like that. . . . And, a dead valley, the roofer does — it is built up like that, see? (Witness indicating.) So, that is where her damage come in. Most of it, I would say. She had a little damage that didn't come in from there, but most of the damage came from that dead valley."
It was Moss's opinion that rainwater leaked under the dead valley because, he said, "without a doubt, they didn't get the felt nailed down good enough." The condition causing the leak could not be seen.
Moss explained further that the original roof was made of wood shingles which had to be removed and decking applied. He had gone inside Mrs. Michael's house and observed that her old roof, which had no decking underneath, was leaking into a back room and a closet. Later, Mrs. Michael complained of leaks which had started after he began the work. He saw a rug which was soaked, and the ceiling, but no other damage.
Mrs. Michael testified that earlier she had sustained damage to her roof caused by hail and had called in three roofers, including Moss, to give her an estimate, ultimately contracting with Moss. She stated that the first crew worked approximately ten days, coming at various times and leaving at various times. It was raining off and on, and, she said, one "could anticipate and expect it would rain during that period of year." The crew removed the twin peaks (on the roof) and roofed it completely with new shingles. They also totally removed the roof and placed one piece of plastic in the center of the twin peaks which, she said, was gone "before *Page 28 
the men were at the end of the street, . . . [because] the wind was blowing very hard." When the roof was removed, she said, it "was open right into the ceiling, right into [the] attic" and "they started putting on the plywood and felt and those parts were okay." She described the process as one in which the crew would put down plywood on a section and then cover that, but the other section was left open. Meanwhile, she added, there was a period of time, for five to eight days, that no roofers came, and during that time her roof was just open and the house exposed to the elements.
It is clear from our cases that the term "accident" in such a policy does not necessarily exclude human fault called negligence. United States Fidelity and Guaranty Company ofAlabama v. Bonitz Insulation Company of Alabama, 424 So.2d 569,571 (Ala. 1982), citing Employers Insurance Company of Alabama,Inc. v. Alabama Roofing Siding Company, 271 Ala. 394,124 So.2d 261 (1960). (In the latter case the insured roofing contractor left a partially replaced roof overnight, with sufficient protection from rain; however, water leakage caused damage. Held: judgment for plaintiff contractor against insurer affirmed.) The decision in Alabama Roofing, supra, followed that in Employers Insurance Company of Alabama v. Rives,264 Ala. 310, 87 So.2d 653 (1955), and involved the same policy language as that in the instant policy. We quote from AlabamaRoofing, 271 Ala. at 396, 124 So.2d 261:
 "Rives entered into a contract with one Williams to install pumps at a filling station and to connect the pumps with underground tanks. In performing this work Rives' employees negligently failed to tighten a connecting nut. As a result of this negligence the well of one Davis became contaminated with gasoline. Davis brought suit against Rives to recover for the damage he had suffered as a result of the contamination of his well. . . ."
Under those facts, this Court ultimately held that the judgment of the trial court in favor of Rives against his insurance company should be upheld, because "accident" as used in the policy did not necessarily exclude negligence. In Bonitz,supra, this Court did not distinguish Alabama Roofing, supra, on the ground insisted upon by the insurance company, i.e., that the damage complained of occurred after the roofing contract:
 "In both cases, there was a `continuous or repeated exposure to conditions' within the definition contained in the policy resulting in property damage. When the property damage began vis-a-vis the roof leaks, there was an occurrence. . . . As Bonitz is merely charged with negligence in installing the roof, there is no evidence that they either expected or intended the roof to start leaking. . . ."
Harleysville Mutual Casualty Company v. Harris Brooks,Inc., 248 Md. 148, 235 A.2d 556 (1967), a case dealing with the application of the policy term "accident," contains analyses of several cases bearing on the point, notably Haynes v. AmericanCasualty Company, 228 Md. 394, 179 A.2d 900 (1962) (construction contractor who pointed out property line and then left construction site not charged with duty to foresee that his employees would cross line and commit trespasses on another's property); Cross v. Zurich General Accident Liability Insurance Company, 184 F.2d 609 (7th Cir. 1950) ("accident" found in damage to glass windows during cleaning because of obvious lack of intent to cause damage by insured and definite steps taken by insured to prevent damage);O'Rourke v. New Amsterdam Casualty Company, 68 N.M. 409,362 P.2d 790 (1961) (roofing company allowed to recover from insurer for rain damage to interior of house under facts disclosing that his telephone calls to weather bureau resulted in his being told "no rain in sight," thus establishing that roofer's precautionary actions had removed possible damage from realm of his foresight or reasonable expectation).
The Harleysville decision quoted from O'Rourke, supra, which had analyzed similar *Page 29 
cases, and observed that "these cases involved conscious acts, as a result of which it could reasonably be foreseen that the damage which actually occurred would result."
In the instant case, the trial court premised its holding upon a finding that the attic space was partially or wholly exposed. With respect, we do not agree that such a fact would establish the absence of an "accident" under this policy. The fact that the roof was exposed for a period of time by theemployees of this roofing contractor does not, under the cases cited, automatically cause him to lose his insurance coverage, any more than his own negligence would do so. Bonitz, supra.
Quite the contrary, the authorities absolve the insured where there is a lack of intent to cause damage or where he has taken reasonable steps to prevent damage and thus could not reasonably foresee the damage caused.
Of course, the presence of successive periods of rain during the pertinent period of time here was not denied. Neither was it disputed that the roof in question was a difficult one. There was no evidence that Moss himself was responsible for the rain, for the departure of two of his roofing crews from the job, or that he was responsible for the delays in finishing it. Moss testified that he had instructed his men to "dry the roof in" with felt. That the attempt was made to keep the roof covered as the work progressed was established by the testimony of Mrs. Michael herself. That it became insufficient was not attributable to Moss, who, for aught that appears from the evidence, did not intend the damage, and who by his personal efforts could not have reasonably foreseen the negligence of his crews in their failure to follow his instructions. Mrs. Michael's complaint against him charged him with negligence (and breach of contract), not conscious acts made with intent to cause damage. His instructions establish his definite steps taken to prevent damage. And finally, after the "repeated exposure to conditions," the roof leaked. Thus, there was an "occurrence" under the policy, and the plaintiff, Champion, is obligated by the terms of the policy to defend the Michael action and perform other duties contracted for thereunder. We find, therefore, that the conclusions of the trial court, under the evidence, were clearly erroneous and against the great weight of the evidence. First Alabama Bank of Montgomery, N.A.v. Martin, 425 So.2d 415 (Ala. 1982).
We contrast this finding with our opinion in United StatesFidelity Guaranty Co. v. Warwick Development Co.,446 So.2d 1021, in which we had the same policy definition of an "occurrence." In United States Fidelity Guaranty Co., we held that a "reliance upon misrepresentations" claimed by the plaintiffs did not constitute an occurrence. We further found under the facts of that case that there was no "property damage" within the definition of the policy provisions.
The judgment in the present case must be, and it is, reversed, and this cause is remanded for further proceedings not inconsistent with this opinion.
REVERSED AND REMANDED.
All the Justices concur.