MURDOCK, Justice
(concurring specially).
I.
The main opinion states that “[t]he only evidence of specific property damage caused by an occurrence identified by either the parties or the trial court and accompanied by evidence of a specific cost associated with repairing or replacing that damage” is $600 worth of damage to certain ceiling tiles. Ill So.3d at 710. I agree.
I note that the construction-defect expert offered by Town & Country Property, L.L.C., and Town & Country Ford, L.L.C. (collectively “T & C”), Mark Moore, testified on pages 254-55 of the trial transcript, Record Vol. 7, p. 1205, that the cost of replacing “the blanket insulation” in the *711 “pre-engineered” portion of the building (the rear of the building, which housed, among other things, the parts and maintenance areas) would be $52,500. Just prior to making this particular statement, Moore had stated, on page 258 of the transcript, that “the blanket insulation” would cost $52,000 to replace. In addition to using the same term to describe the insulation at issue, this earlier statement also was made in the context of questions regarding the correction of defects in the “pre-engi-neered” roof over the rear of the building.
T & C suggests that the $52,000 first referenced by Moore was intended as a separate amount, one that related to the replacement of insulation in the front portion of the building (the office and showroom area), as opposed to the replacement of insulation over the rear portion of the building. As such, according to T & C, the damage represented by that figure would represent “property damage” resulting from an “occurrence,” namely rainwater damage to a part of the structure other than the defectively constructed portion of the structure (the roof) that allowed the rainwater to penetrate.
I have considered whether T & C’s interpretation of Moore’s testimony is appropriate, i.e., whether we can and should conclude from Moore’s testimony that one of these two similar amounts may be attributed solely to the cost of replacing insulation in the front of the building that was damaged by rainwater and that was not itself part and parcel of a defectively installed roof. I cannot conclude that we can. As noted, Moore refers to both figures as the cost of replacing “the blanket insulation.” Further, both statements are made in the context of or with express reference to the “pre-engineered” rear of the building. Further still, the inclusion of an additional $52,000 would make it impossible to reconcile mathematically the sum of the individual repair and replacement costs listed by Moore throughout his testimony with the $751,346 total cost of repairs Moore himself calculates after listing the individual costs.
In other words, we have little choice but to conclude that Moore included in his final tally of damages a single amount, $52,500, attributable to the replacement of insulation. Even if we could conclude that this amount was not limited to the replacement of the insulation that was part of the defective roofing system covering the rear of the building, we have no testimony from which we could determine what portion of that cost should be attributed to the replacement of insulation in the front of the building. Without such testimony, this Court itself would have to engage in speculation to award some portion of this amount to T & C.
II.
That said, there is one additional matter I believe should be addressed in light of the arguments made by T & C and amicus curiae Alabama Associated General Contractors, Inc., to this Court on rehearing in the present case. This additional matter concerns the caveat we recognized in our essential holding in Town & Country Property, L.L.C. v. Amerisure Insurance Co., Ill So.3d 699, 712 (Ala.2011) (“Town & Country I ”).
The essential holding in Town & Country I was that “faulty workmanship itself is not an occurrence” within the meaning of a contractor’s comprehensive general-liability (“CGL”) policy. Specifically, we held as follows in our analysis in Part III of the opinion:
“Reading Moss [v. Champion Insurance Co., 442 So.2d 26 (Ala.1983),] and [United States Fidelity & Guaranty Co. v.] Warwick [Development Co., 446 So.2d *712 1021 (Ala.1984),] together, we may conclude that faulty workmanship itself is not an occurrence but that faulty workmanship may lead to an occurrence if it subjects personal property or other parts of the structure to ‘continuous or repeated exposure’ to some other ‘general harmful condition’ (e.g., the rain in Moss) and, as a result of that exposure, personal property or other parts of the structure are damaged.”
111 So.3d at 706 (emphasis added). In addition to the essential holding emphasized above, we recognized one caveat: “[Fjaulty workmanship may lead to an occurrence if it subjects personal property or other parts of the structure” to an accidental harmful condition that damages that “other part.” 111 So.3d at 706 (emphasis added).
In Part IV of our opinion in Town & Country I, we offered concluding comments and instructions to the trial court as to how to implement our decision on remand. In this portion of our opinion, we first reaffirmed the above-stated general rule by explaining that the trial court’s judgment in favor of Amerisure was affirmed “to the extent the ... damages [awarded to T & C in T & C’s underlying action against Amerisure’s insured, Jones-Williams Construction Company,] represented the costs of repairing or replacing the faulty work itself.” We then made the following statement, however, adding to the language we had earlier used in Part III to delineate the caveat to the general rule:
“We are remanding the case to the trial court so that it may consider arguments from the parties to determine if any of the damages awarded represented compensation for damaged personal property — e.g., computers and furnishings — or otherwise nondefective portions of the facility.”
111 So.3d at 708 (emphasis added).
In concurring in Town & Country I, I failed to take sufficient heed of the wording of the latter phrase and to consider the difference between it and the wording of the caveat as expressed in the analysis portion of our opinion. Concern has been expressed that the latter wording can be read as a restriction on the caveat recognized in Part III of our opinion in Town & Country I to parts of the structure completely free from any defect of their own, rather than simply to “other parts of the structure” apart from the defectively constructed portion primarily at issue. That is, concern has been expressed that the emphasized passage may be construed to mean that when one portion of a structure, such as a roof, is defectively constructed so as to allow into a building rainwater that damages some “other part of the structure,” such as a floor, there is no “occurrence” if the “other part of the structure” already had any defect of its own, even if that defect would not itself have necessitated repair or replacement costs equal to those necessitated by the water damage. This specific issue was not presented by the arguments made to us in Town & Country I. Further, as it now turns out, the record before us makes it unnecessary to address this issue in order to decide this case. Accordingly, I consider the issue reserved for another day.