[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-12151
_____

D.C. Docket No. 1:13-cv-00066-KD-M

PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE
COMPANY,

Plaintiff-Counter Defendant-Appellee,

versus

ST. CATHERINE OF SIENA PARISH,

Defendant-Appellant,

KIKER CORPORATION,

Defendant-Counter Claimant.
_____

Appeal from the United States District Court
for the Southern District of Alabama
_____

(June 10, 2015)

Before TJOFLAT, JILL PRYOR and ANDERSON, Circuit Judges.

JILL PRYOR, Circuit Judge:

This appeal presents the question of whether insurer Pennsylvania National Mutual Casualty Insurance Company ("Penn National") has a duty to indemnify its insured, Kiker Corporation ("Kiker"), with respect to a judgment St. Catherine of Siena Parish (the "Parish") obtained against Kiker for breach of contract after Kiker's faulty repairs to the church's roofs caused leaks. Penn National argues that under the terms of Kiker's commercial general liability insurance policy (the "Policy"), there is no coverage and thus no duty to indemnify Kiker. The district court agreed, granted summary judgment to Penn National, and denied summary judgment to the Parish. To resolve the Parish's appeal, we must decide two issues: (1) whether Kiker's conduct that caused the Parish's property damage constitutes an "occurrence" under the terms of the Policy and (2) if so, whether the Policy's contractual liability exclusion nonetheless bars coverage for the Parish's breach of contract claim alleging a breach of the implied warranty of workmanship.

Whether there was an occurrence under the Policy turns not, as Penn National urges, on the fact that the Parish's claim against Kiker was breach of contract, but, instead, on whether Kiker's conduct that caused damage to the Parish's property was accidental. Because the conduct that caused damage to the Parish was accidental, the damage is covered under the Policy. As to Penn National's second argument, that it has no duty to indemnify Kiker because of the Policy's contractual liability exclusion, we hold that the exclusion is inapplicable

2

here. Thus, the district court erred in granting Penn National's summary judgment motion and denying the Parish's motion. We reverse the district court's grant of summary judgment in favor of Penn National, vacate the denial of summary judgment to the Parish, and remand to the district court with instructions to enter judgment in favor of the Parish.

## I. FACTUAL BACKGROUND

### A. Kiker Repairs the Parish's Roofs

In 2003, the Parish, a Catholic church located in Mobile, Alabama, hired Kiker to repair its main roof by removing the existing shingles and installing new ones.[1] Shortly after beginning work, Kiker discovered that the deck supporting the roof was made of gypsum panels surrounded by metal bands.[2] Kiker had no experience working with gypsum and did not know how to install shingles on a roof with a gypsum deck. After doing some research, Kiker planned to install a new plywood deck over the existing gypsum deck and attach new shingles to the plywood deck. Kiker then learned that it would be cheaper to use a special fastener, the ES Do-All Loc-Nail, to attach the shingles directly to the existing gypsum deck, so Kiker opted to use the fastener and completed the work.

---

[1] In turn, Kiker hired a subcontractor, Damon Lett Roofing, to perform the work. For purposes of this opinion, references to Kiker's work include work performed by the subcontractor.

[2] Gypsum is a substance with a consistency similar to drywall. When gypsum is exposed to water, it breaks down and turns to powder.

3

In 2005, the Parish hired Kiker to repair leaks in a secondary roof, known as the horseshoe roof. The horseshoe roof was a low-slope roof. Kiker told the Parish that the leaks could be fixed by adding a pitch to the roof, which would allow water to flow off the roof into downspouts. A few months after Kiker finished work on the horseshoe roof, water began to leak through the ceiling underneath. When the Parish complained, Kiker inspected the horseshoe roof and concluded that it was not leaking. Kiker told the Parish that the leaks were caused instead by water flowing through a brick wall that abutted the roof and recommended that the Parish to apply sealant to the bricks to stop the leaking. The Parish followed Kiker's instructions, but the leaks continued. In 2008, water began to leak through the ceiling under the main roof. Kiker returned to the Parish between 40 and 50 times to investigate leaks. Each time Kiker reported that the roofs were not causing the leaks.

In 2010, the Parish hired a roof inspector to inspect both roofs. The inspection of the main roof showed that Kiker's improper installation of the ES Do-All Loc-Nail fasteners caused the leaks. To secure shingles to a gypsum deck, the fasteners must be nailed directly into the gypsum deck, not the steel bands that surround the gypsum. But, Kiker tried to force the ES Do-All Loc-Nails into the steel bands. The nails could not penetrate the steel and tore the shingles or caused

4

the shingles not to lie flat.[3]  As a result, water was able to flow between the shingles to the gypsum deck below, transforming the gypsum from a hard, solid surface into powder; thus, it could no longer support the roof and had to be replaced.  Water also flowed through the gypsum deck to the Parish's ceiling under the main roof, destroying the ceiling's plaster.

The inspection revealed problems with Kiker's work on the horseshoe roof as well.  The horseshoe roof also had a gypsum deck, and Kiker used the same fasteners to install the new shingles on that roof.  The inspection also revealed a defect in the flashing in the brick wall that abuts the horseshoe roof.  Water entered the bricks above the horseshoe roof, flowed through the bricks instead of onto the roof, and eventually reached the ceiling where it caused leaks.  Before Kiker worked on the roof, through-wall copper flashing in the bricks forced water out of the brick wall onto the roof's surface.  But Kiker covered over the through-wall copper flashing so that it no longer directed water onto the roof.  Kiker then installed surface-mounted flashing, but the new flashing was ineffective in forcing water out of the bricks and onto the roof.  Without the proper flashing, water flowed through the bricks and leaked into the building.

---

[3] Kiker should have laid felt between the deck and shingles to serve as additional protection from water, but in many places Kiker failed to install the felt.

## B. The Parish Sues Kiker

The Parish sued Kiker in state court, alleging that Kiker breached the implied warranty in the parties' contract that required Kiker to complete the project using reasonable skill. Upon being served with the Parish's complaint, Kiker notified Penn National, and Penn National defended Kiker under a reservation of rights.

The Parish's breach of contract claim was tried to a jury.[4] At trial the Parish sought more than $400,000 in damages, which included the cost of repairing the water damage to the Parish's ceilings and replacing the main roof, the horseshoe roof, and the roofs' decks. The jury, using a general verdict form, awarded the Parish $350,000.

## C. Penn National Seeks a Declaratory Judgment

After final judgment was entered, Penn National filed a declaratory judgment action in district court against the Parish and Kiker, seeking a declaration that it has no duty to indemnify Kiker with respect to the $350,000 verdict. Penn National and the Parish each moved for summary judgment. The district court granted Penn National's motion and denied the Parish's. The court concluded that

---

[4] The Parish brought other claims against Kiker, which were not submitted to the jury. The Parish also sued the engineers who recommended the ES Do-All Loc-Nails; those claims settled prior to trial.

the Policy's contractual liability exclusion bars coverage and entered a declaration

that Penn National owes no duty to indemnify.  The Parish appealed.

## II. STANDARD OF REVIEW

"We review a district court's grant or denial of summary judgment de novo."

*Brown v. Sec'y of State of Fla.*, 668 F.3d 1271, 1274 (11th Cir. 2012).  Summary

judgment is appropriate "where the moving party . . . 'shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law.'"  *Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1331 (11th Cir.

2014) (quoting Fed. R. Civ. P. 56(a)), *cert. denied*, 153 S. Ct. 1423 (2015).  "The

interpretation of provisions in an insurance contract is a question of law, also

reviewed *de novo*."  *Stephens v. Mid-Continent Cas. Co.*, 749 F.3d 1318, 1321

(11th Cir. 2014).  The parties agree that in this diversity action Alabama law

governs our interpretation of the Policy.

## III. ANALYSIS

### A. Has the Parish Shown Its Injuries Were Caused by an Occurrence?

The terms of the Policy define the scope of Penn National's duty to

indemnify Kiker, its insured.  The Policy provides that Penn National will pay only

"those sums that the insured becomes legally obligated to pay as damages because

7

of 'bodily injury' or 'property damage' to which this insurance applies."[5]  Policy at

§ I.A.1.a.  The Policy further limits coverage to those instances where the "'bodily

injury' or 'property damage' is caused by an 'occurrence.'"  *Id.* at § I.A.1.b.(1).

When an insured causes multiple injuries, coverage is determined on an

injury-by-injury basis, and the insurer is obligated only to indemnify for damages

arising out of the covered injuries.[6]  *See, e.g., Town & Country Prop., L.L.C. v.*

*Amerisure Ins. Co.*, 111 So. 3d 699, 710 (Ala. 2012) (holding that insurer was

required to indemnify its insured only for damages covered under policy where

injured party sought damages in underlying action for various injuries, only some

of which were caused by an occurrence); *United States Fid. & Guar. Co. v. Bonitz*

*Insulation Co. of Ala.*, 424 So. 2d 569, 573-74 (Ala. 1982) (explaining that

although damage to roof was not covered under policy, damage to ceilings, walls,

carpets, and gym floor was covered).

### 1.  Occurrence Under Alabama Law

The Policy defines an "occurrence" as "an accident, including continuous or

repeated exposure to substantially the same general harmful conditions."  Policy at

§ V.13.  According to the Supreme Court of Alabama, in the insurance context an

---

[5] The Policy defines property damage as "[p]hysical injury to tangible property, including all resulting loss of use of that property."  Policy at § V.17.  Penn National concedes that the Parish's injuries are "property damage" under the Policy.

[6] It does not appear that the district court engaged in an injury-by-injury analysis.  *See Penn. Nat'l Mut. Cas. Ins. Co. v. St. Catherine of Siena Par.*, 16 F. Supp. 3d 1370, 1378-79 (S.D. Ala. 2014).

"accident" is "[a]n unintended and unforeseen injurious occurrence; something that does not occur in the usual course of events or that could [not] be reasonably anticipated." *Hartford Cas. Ins. Co. v. Merchs. & Farmers Bank*, 928 So. 2d 1006, 1011 (Ala. 2005) (internal quotation marks omitted). Put differently, an accident is "something unforeseen, unexpected, or unusual." *Id.* (internal quotation marks omitted). When the insured makes an error in judgment but "at all times acted in a deliberate and purposeful manner," its conduct does not constitute an accident or occurrence. *Id.* at 1013 (quoting *Mindis Metals, Inc. v. Transp. Ins. Co.*, 209 F.3d 1296, 1301 (11th Cir. 2000)).

In the underlying case, the Parish alleged that Kiker breached the parties' contract by failing to complete the work properly. Alabama law creates an implied warranty that a contractor will "use reasonable skill in fulfilling his contractual obligations." *Blackmon v. Powell*, 132 So. 3d 1, 5 (Ala. 2013) (quoting *Turner v. Westhampton Court, L.L.C.*, 903 So. 2d 82, 93 (Ala. 2004)). Even when a contractor has completed the contracted work, she can be held liable for breaching the parties' contract and the implied warranty if she failed to use reasonable skill in performing her work. *Id.*

When a contractor performs faulty work (that is, fails to use reasonable skill), there is no accident or occurrence, but, when the contractor's faulty work creates a condition that in turn damages property, under Alabama law, that damage

9

results from an accident.  *See Owners Ins. Co. v. Jim Carr Homebuilder, LLC*, 157

So. 3d 148, 155-56 (Ala. 2014).  Thus, the question of "whether poor workmanship

can lead to an occurrence . . . depends 'on the nature of the damage' that results

from the faulty workmanship."  *Id.* at 153 (quoting *Town & Country Prop., L.L.C.

v. Amerisure Ins. Co.*, 111 So. 3d 699, 705 (Ala. 2011)).  For example, when a

contractor hired to repair a roof performs the work poorly so that the roof must be

replaced, there is no accident covered by the Policy.  *See Berry v. S. Car. Ins. Co.*,

495 So. 2d 511, 513 (Ala. 1985).[7]  In contrast, when a contractor is hired to repair

a roof and his work causes a leak that damages the building's ceilings, walls, or

floors, there is an accident, and the cost of repairing the ceilings, walls, or floors is

covered.  *See Bonitz Insulation*, 424 So. 2d at 573.

Penn National argues that the Parish's injuries are not covered because Kiker

acted intentionally when it breached the contract.  But this argument is another

way of saying that repairs to Kiker's faulty work itself are not covered.  Penn

National overlooks that the Parish's breach of contract claim was based on a

breach of the implied warranty of workmanship and Kiker's failure to use

reasonable skill.  To the extent that Kiker's faulty work created a condition that

---

[7] Penn National argues that *Berry* stands for the proposition that a breach of contract claim cannot give rise to an occurrence.  We disagree.  In *Berry* the court acknowledged that a contractor's faulty work can give rise to an occurrence when the faulty work creates a condition that causes property damage.  495 So. 2d at 512-13.

caused property damage, an accident occurred under Alabama law. *See Jim Carr*, 157 So. 3d at 155.

In support of its argument that a breach of contract is intentional and not an accident or occurrence, Penn National cites three Supreme Court of Alabama cases. However, these cases do not address the meaning of occurrence or whether breaching a contract must be an intentional act. First, in *American States Insurance Co. v. Martin*, the Alabama Supreme Court held there was no coverage because the injured party's damages did not qualify as property damage. 662 So. 2d 245, 249 (Ala. 1995). Because the case turned on whether the injuries were property damage, it does not support Penn National's argument about the meaning of an occurrence.

In *Ajdarodini v. State Auto Mutual Insurance Co.*, the Alabama Supreme Court summarily concluded that an insurance policy did not cover the injured party's breach of contract claim because exclusions to the policy barred coverage for "liability assumed by the insured under any contract or agreement" and for the "loss of use of tangible property which has not been physically injured or destroyed resulting from . . . the failure of the named insured's products or work." 628 So. 2d 312, 313 (Ala. 1993). Rather than addressing whether breach of contract is an intentional act, the portion of *Ajdarodini* on which Penn National relies interprets the scope of the policy's exclusions.

In the third case Penn National cites, the Supreme Court of Alabama held there was no coverage where there was no evidence showing that the insured's breach of contract caused the injuries. *See Reliance Ins. Co. v. Gary C. Wyatt, Inc.*, 540 So. 2d 688 (Ala. 1988). In *Gary C. Wyatt*, a contractor leased a crane and agreed to name the lessor as an additional insured but failed to do so. When one of the contractor's employees was injured by the crane, the employee sued the contractor, lessor, and crane manufacturer. The lessor then sued the contractor for breach of contract based on its failure to procure insurance. *Id.* at 688-89. The contractor's insurer sought a declaration that it had no duty to indemnify the contractor with respect to the lessor's breach of contract claim. The Court did not address or discuss whether the contractor's failure to procure insurance was an accident or an intentional act. Instead, the Court held there was no coverage because there was no causal connection between the breach of contract and the employee's injuries. *See id.* at 691 ("The breach of contract was the failure to procure liability insurance. . . . The contract had been breached, with or without [the employee's] injury.").[8]

---

[8] Penn National also urges us to adopt the reasoning of Alabama district courts that have concluded a breach of contract based on faulty workmanship does not constitute an occurrence. *See, e.g.*, *Owners Ins. Co. v. Shep Jones Constr. Inc.*, No. 08-AR-514, 2012 WL 1642169 (N.D. Ala. May 3, 2012). Of course, we are not bound by district courts' decisions, and we decline to adopt their reasoning because we believe it to be inconsistent with the Alabama Supreme Court's subsequent decision in *Jim Carr*.

To summarize, the Policy obligates Penn National to indemnify Kiker for property damage or personal injury caused by an occurrence, meaning an accident. A property owner's claim against a contractor for faulty workmanship does not arise out of an accident or occurrence. However, a claim for damage resulting from a condition caused by the contractor's faulty work may arise out of an accident and be covered as an occurrence.

## 2. The Parish's Injuries as Occurrences

With these principles in mind, we turn to the question of whether the Parish was awarded damages in the state court action for injuries caused by an occurrence. The Parish, as the party seeking coverage under the Policy, bears the burden of proving that coverage exists. *See Ala. Hosp. Ass'n Trust v. Mut. Assurance Soc'y of Ala.*, 538 So. 2d 1209, 1216 (Ala. 1989).

We begin by identifying the injuries for which the Parish recovered damages in the underlying action. Where, as here, the jury used a general verdict form and did not identify each injury for which it was awarding damages, it is appropriate, under Alabama law, to look to the record of the trial in the underlying action to identify the injuries for which the injured party sought damages. *See, e.g., Town & Country Prop.*, 111 So. 3d at 710 n.1 (relying, for purposes of determining scope of insurers' duty to indemnify, on record from underlying trial to identify damages that injured party sought); *Knutilla v. Auto-Owners Ins. Co.*, 578 So. 2d 1359 (Ala.

13

Civ. App. 1991) (looking to types of damages sought at trial in underlying action to determine scope of coverage under surety bond when jury returned a general verdict). The trial record in the underlying action shows that the Parish sought damages for the costs of repairing the water damage to its ceilings, improper installation of shingles on both roofs, and destruction of the roofs' gypsum decking. We must now consider whether each of these injuries is covered under the Policy as property damage caused by an occurrence.

At trial, the Parish sought $104,127.63 for repairing the ceilings. The water damage to the ceilings was the result of an accident and is covered as an occurrence. Kiker did not perform any work on the Parish's ceilings, meaning the ceilings were not part of Kiker's faulty work. Instead, the ceilings were damaged through an accident: repeated exposure to water that either came through the shingles because Kiker failed to install them properly or under the roof because Kiker improperly installed flashing in the brick wall connected to the horseshoe roof. *See Moss v. Champion Ins. Co.*, 442 So. 2d 26, 29 (Ala. 1983) (holding that water damage to homeowner's attic and ceiling during contractor's installation of new roof constituted an occurrence).

The Parish also sought $292,544 for repairing the main roof and the gypsum deck underneath the main roof. The damage to the gypsum deck was caused by an accident because Kiker performed no work on the gypsum deck. Rather, the

14

gypsum deck was damaged because Kiker improperly installed the shingles, causing water to flow through the shingles to the gypsum deck. Thus, we cannot conclude that the gypsum deck was part of Kiker's faulty work.

The costs the Parish incurred to replace the gypsum deck included removing the main roof's shingles to reach the gypsum deck, removing the gypsum deck, and installing a new roof deck and shingles. Because the Parish incurred all of these costs as a necessary part of replacing the gypsum deck, the costs are all covered under the Policy. The Policy provides that Penn National is liable for "sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." Policy at § I.A.1.a. If the Parish had removed and replaced the shingles solely to repair Kiker's faulty workmanship in installing them, then the cost would not be covered under the Policy. But here, the cost of removing and replacing the shingles is covered because these tasks necessarily had to be undertaken to repair the damaged gypsum deck.

Finally, the Parish sought $35,188 for replacing the horseshoe roof. Importantly, these damages did not include the cost of installing new through-wall flashing, even though Kiker improperly covered over the existing through-wall flashing. The Parish presented evidence that the horseshoe roof, like the main roof, had a gypsum deck on which Kiker used the same fasteners. From this

15

evidence, we can infer that the Parish replaced the horseshoe roof and deck for the same reason as the main roof, that is, to repair damage to the gypsum deck caused by water leaking through the improperly installed shingles. As a result, the Parish's injury was caused by an accident, and the cost of replacing the horseshoe roof and its deck is covered under the Policy.

Because all of the Parish's injuries in the underlying action were caused by an accident, they are covered under the terms of the Policy. Penn National, therefore, has a duty to indemnify Kiker for the entire $350,000 verdict.

### B. Does the Contractual Liability Exclusion Apply?

Penn National argues that, even if the Parish's injuries were covered as occurrences, it has no duty to indemnify Kiker because the Policy's contractual liability exclusion bars coverage in this case. As the insurer, Penn National bears the burden of proving that the exclusion applies. *Acceptance Ins. Co. v. Brown*, 832 So. 2d 1, 12 (Ala. 2001). The district court found that the exclusion bars coverage for the Parish's claim. Because the district court's interpretation of the exclusion is inconsistent with the Policy's plain language and a decision of the Supreme Court of Alabama construing an identical provision, the district court erred in concluding that the exclusion bars coverage here.

We first examine the language of the Policy's contractual liability exclusion. Under the exclusion, no coverage exists for "'bodily injury' or 'property damage'

16

for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement." Policy at § I.A.2.b. By its plain language, the exclusion bars coverage for claims based on an assumption of liability in an indemnity agreement. The Parish's breach of contract claim based on Kiker's breach of an implied warranty does not fall within the exclusion. Although the implied warranty creates a duty for a contractor to use "reasonable skill" in performing his work under the contract, this duty does not constitute an assumption of liability. *See Blackmon*, 132 So. 3d at 5.

Indeed, the Alabama Supreme Court has interpreted an identical exclusion as barring coverage only where the insured agreed to indemnify another party. *Townsend Ford, Inc. v. Auto-Owners Ins. Co.*, 656 So. 2d 360, 364 (Ala. 1995) (explaining that purpose of identical exclusion was to bar coverage for "claims involving indemnity contract liability"). Here, the district court considered *Townsend Ford* distinguishable because the injured party in that case sued the insured for breach of an express warranty, while the Parish sued Kiker for breach of an implied warranty. This is not a meaningful distinction. The Supreme Court of Alabama's logic in *Townsend Ford*—that a provision excluding from coverage "damages by reason of the assumption of liability in a contract" was intended to exclude claims arising out of indemnity agreements only—applies regardless of

17

whether the injured party brings a breach of contract claim based on the breach of an express or implied warranty.  *See id.*

In arguing that *Townsend Ford* does not apply, Penn National urges us to follow earlier cases in which the Alabama Supreme Court held that a contractual liability exclusion bars coverage for all claims sounding in contract.  *See Carter v. Cincinnati Ins. Co.*, 435 So. 2d 42 (Ala. 1983); *United States Fid. & Guar. Co. v. Nat'l Tank & Mach. Works, Inc.*, 402 So. 2d 925 (Ala. 1981); *see also Ajdarodini*, 628 So. 2d at 313-14.  Assuming, *arguendo*, that under the reasoning of these cases the Policy's contractual exclusion would bar the Parish's claim, those decisions conflict with the Alabama Supreme Court's later holding in *Townsend Ford*.  As a federal court sitting in diversity, we are bound to follow "the latest statement of state law by the state supreme court."  *World Harvest Church, Inc. v. Guideone Mut. Ins. Co.*, 586 F.3d 950, 957 (11th Cir. 2009); *see Delta Air Lines, Inc. v. McDonnell Douglas Corp.*, 503 F.2d 239, 245 (5th Cir. 1974).[9]  Thus, the contractual liability exclusion does not bar coverage for the Parish's breach of contract claim alleging a breach of implied warranty.

---

[9] Decisions of the former Fifth Circuit rendered prior to close of business on September 30, 1981, are binding on this Court.  *See Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

18

## IV. CONCLUSION

The Parish's injuries are covered under the Policy, and the contractual liability exclusion does not bar coverage here.  Penn National thus has a duty to indemnify Kiker as to the entire $350,000 judgment.  Accordingly, we reverse the district court's grant of summary judgment to Penn National.  We also vacate the district court's denial of summary judgment to the Parish and remand the case to the district court with instructions to enter judgment in favor of the Parish.

**REVERSED IN PART, VACATED IN PART, and REMANDED.**