[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 13-10170 & 13-15741
_____

D.C. Docket No. 4:10-cv-10110-JLK

JENNIFER A. STEPHENS, as Personal Representative of the
Estate of Charles Eugene Becker and as Assignee of
Anchorage Homes, LLC,

Plaintiff - Appellant,

versus

MID-CONTINENT CASUALTY COMPANY,

Defendant – Appellee.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(April 24, 2014)

Before PRYOR and JORDAN, Circuit Judges, and FRIEDMAN,* District Judge.

FRIEDMAN, District Judge:

_____

* Honorable Paul L. Friedman, United States District Judge for the District of Columbia, sitting
by designation.

In this appeal, we are asked to review the district court's interpretation of an exclusion in an insurance policy issued by the appellee, Mid-Continent Casualty Company, to a construction contractor, Anchorage Homes LLC, and the district court's conclusion that Mid-Continent Casualty Company was entitled to summary judgment based on that exclusion. We affirm the grant of summary judgment, though on different grounds than those articulated by the district court. We also affirm the district court's order awarding fees and costs to Mid-Continent Casualty Company.

## I.  BACKGROUND

On June 7, 2008, Charles Eugene Becker was working on a construction job in Little Torch Key, Florida, helping to install a modular home on the property of Jeffrey and Connie Kirkland. Near the end of the day, Becker began climbing down a ladder attached to the side of the two-story home when the ladder detached from the house. Both Becker and the ladder fell to the ground. Critically injured, Becker died on the way to the hospital.

The representative of Becker's estate, Jennifer Stephens, subsequently brought a wrongful death suit in Florida state court against the following parties: Becker's direct employer, Team Fritz; the Kirklands; and Anchorage Homes LLC ("Anchorage"), another contractor working on the modular home construction project. The present appeal stems from Stephens' claims against Anchorage.

2

At the time of the accident, Anchorage held a commercial general liability insurance policy with Mid-Continent Casualty Company ("Mid-Continent"). Under this policy, Mid-Continent agreed to "pay those sums that [Anchorage] becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." The policy also provided that Mid-Continent had "the right and duty to defend the insured against any 'suit' seeking those damages." In addition, the policy contained several exclusions from coverage, including an exclusion of damages relating to injuries to any of Anchorage's employees.

Upon learning that Stephens had initiated a suit in state court and had named Anchorage as one of the defendants, Anchorage filed a claim with Mid-Continent, seeking legal defense and indemnification. On April 20, 2009, Mid-Continent notified Anchorage that its insurance policy excluded coverage for damages arising from Becker's death, and that Mid-Continent therefore would not defend or indemnify Anchorage. Mid-Continent explained that its investigation had revealed that Anchorage, as construction contractor for the Kirkland project, had employed Team Fritz as a subcontractor. According to Mid-Continent, Team Fritz's employees therefore were the "statutory employees" of Anchorage under Florida law. Any liability for injury to Becker therefore was excluded from coverage under the policy's employee exclusion clause.

3

After receiving this letter, Anchorage proceeded in the state court proceedings with its own counsel.  On August 27, 2010, Stephens and Anchorage signed a mediated settlement agreement and executed a so-called Coblentz agreement, which resolved Stephens' claims against Anchorage.  Under this agreement, Anchorage stipulated to the entry of a judgment in favor of Stephens in the amount of $4,350,000, and Anchorage assigned to Stephens its rights with respect to its claims against Mid-Continent.  In turn, Stephens agreed not to collect the amount of the judgment from Anchorage.

On December 8, 2010, Stephens, as assignee of Anchorage, brought suit against Mid-Continent in the U.S. District Court for the Southern District of Florida, asserting that Mid-Continent had wrongfully refused to defend and indemnify Anchorage in the state court proceedings, and seeking as relief the judgment amount of $4,350,000.  After various pre-trial matters, including discovery and proceedings on a motion to dismiss, the parties filed cross-motions for summary judgment.  The district court granted Mid-Continent's motion and denied Stephens' motion, concluding that the Coblentz agreement could not be enforced against Mid-Continent as a matter of law.  Stephens v. Mid-Continent Cas. Co., 915 F. Supp. 2d 1320 (S.D. Fla. 2013).  The district court reasoned that the state court pleadings and the record evidence established that Becker was

4

exempted from Anchorage's insurance policy with Mid-Continent under the policy's employee exclusion clause. Id. at 1331-34. Stephens brings this appeal.

## II. STANDARD OF REVIEW

We review a district court's grant of summary judgment *de novo*, viewing all the evidence, and drawing all reasonable factual inferences, in favor of the non-moving party. See, e.g., Kragor v. Takeda Pharm. Am., Inc., 702 F.3d 1304, 1307 (11th Cir. 2012). The interpretation of provisions in an insurance contract is a question of law, also reviewed *de novo*. James River Ins. Co. v. Ground Down Eng'g, Inc., 540 F.3d 1270, 1274 (11th Cir. 2008). The decision of a district court to award attorney's fees is reviewed for abuse of discretion. Menchise v. Akerman Senterfitt, 532 F.3d 1146, 1149 (11th Cir. 2008).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once the movant adequately supports its motion, the burden shifts to the nonmoving party to show that specific facts exist that raise a genuine issue for trial." Dietz v. Smithkline Beecham Corp., 598 F.3d 812, 815 (11th Cir. 2010). If the non-movant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–50, 106 S. Ct. 2505, 2511 (1986); see Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776 (2007) ("[W]here the record

taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial.'") (internal quotation omitted).  The Court may uphold the district court's judgment "on any ground that finds support in the record." Strickland v. Norfolk S. Ry. Co., 692 F.3d 1151, 1154 (11th Cir. 2012) (quoting Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1256 (11th Cir. 2001)).

## III.  DISCUSSION

As noted, Stephens brings this suit against Mid-Continent pursuant to a Coblentz agreement with Anchorage.  See Coblentz v. Am. Sur. Co. of New York, 416 F.2d 1059 (5th Cir. 1969).  In Coblentz, the Fifth Circuit held that if a liability insurer is informed of an action against its insured, but declines to defend the insured, the insurer may be held to a consent judgment entered in that action, absent fraud or collusion.  Id. at 1062-63; see also Perera v. U.S. Fid. & Guar. Co., 35 So. 3d 893, 899–900 (Fla. 2010).  To recover from Mid-Continent the sums awarded under the Coblentz agreement she entered into with Anchorage, Stephens must prove (a) that Mid-Continent wrongfully refused to defend Anchorage in the underlying state court action; (b) that Mid-Continent had a duty under the insurance policy to indemnify Anchorage; and (c) that the settlement between Anchorage and Stephens was reasonable and made in good faith.  See Chomat v.

6

N. Ins. Co. of New York, 919 So. 2d 535, 537 (Fla. 3d DCA 2006); Mid-Continent

Cas. Co. v. Am. Pride Bldg. Co., LLC, 534 F. App'x 926, 928 (11th Cir. 2013).

### A.  Interpretation of the Insurance Policy

The parties dispute the meaning of the insurance policy's employee

exclusion clause, which limits the scope of Mid-Continent's duties to defend and to

indemnify.  We therefore begin by analyzing this provision, the interpretation of

which is a matter of law.  James River Ins. Co., 540 F.3d at 1274.

Anchorage's insurance policy with Mid-Continent includes a standard

employee exclusion clause, which states that Mid-Continent will not cover

"'[b]odily injury' to . . . [a]n 'employee' of the insured arising out of and in the

course of . . . [e]mployment by the insured."  This exemption expressly refers to

"employees," and all parties agree that Becker was not a literal employee of

Anchorage.  Nevertheless, Mid-Continent maintained, and the district court agreed,

that Florida law provides that standard employee exclusion clauses like the one at

issue here apply both to actual employees and to "statutory employees."  Stephens,

915 F. Supp. 2d at 1331–32.  Stephens contends that the policy must be read

literally, such that the exclusion clause is limited to actual employees.  We reject

Stephens' argument and affirm the district court's decision on this point.

Under Florida law, a contractor who sublets part of its work to a

subcontractor develops a statutory employment relationship with the employees of

7

that subcontractor.  As the district court correctly noted, the concept of a "statutory employee" derives from Florida's Workers' Compensation Law, Fla. Stat. §§ 440.01 *et seq*.  See Florida Ins. Guar. Ass'n, Inc. v. Revoredo, 698 So. 2d 890, 891–92 (Fla. 3d DCA 2006).  The Act states, in relevant part:

> (a) . . . Any contractor or subcontractor who engages in any public or private construction in the state shall secure and maintain compensation for his or her employees under this chapter as provided in s. 440.38.
>
> (b) In case a contractor sublets any part or parts of his or her contract work to a subcontractor or subcontractors, all of the employees of such contractor and subcontractor or subcontractors engaged on such contract work shall be deemed to be employed in one and the same business or establishment, and the contractor shall be liable for, and shall secure, the payment of compensation to all such employees, except to employees of a subcontractor who has secured such payment.

Fla. Stat. § 440.10(1).  The Florida Supreme Court has explained that the "effect of section 440.10 is that where a subcontractor performing part of the work of a contractor fails to secure payment of compensation, the contractor is liable for same."  Motchkavitz v. L.C. Boggs Indus., Inc., 407 So. 2d 910, 912 (Fla. 1981), overruled on other grounds, Emp'rs Ins. of Wausau v. Abernathy, 442 So. 2d 953, 954 (Fla. 1983).

Under Florida law, "[s]tatutory employees have been treated identically to actual employees in relation to standard employee exclusion clauses."  Revoredo, 698 So. 2d at 892 (citing Dodge v. Fid. & Cas. Co. of N.Y., 424 So. 2d

8

39 (Fla. 5th DCA 1982) and Michaels v. U.S. Fid. & Guar. Co., 129 So. 2d 427

(Fla. 2d DCA 1961)).  In Revoredo, Florida's Third District Court of Appeals

reasoned:

> The logic in the exclusion from coverage of both types of employees is simple and compelling: the only coverage intended, and for which the premium has been paid, is the liability of the insured *to the public*, as distinguished from liability to the insured's employees whether or not they are protected by the workers' compensation law. . . . [the statute] does not make the statutory employer-employee relationship contingent on the securing of workers' compensation for the employee.

Id. (emphasis added); see also Amerisure Ins. Co. v. Orange & Blue Const., Inc.,

545 F. App'x 851, 855 (11th Cir. 2013) ("Unlike worker's compensation insurance

or employer's liability insurance, which exist to provide employers with coverage

for injuries that occur to employees during the scope of employment, the sole

purpose of commercial general liability insurance is to provide coverage for

injuries that occur to the public-at-large.").

The district court correctly concluded that Florida's law requires that the

employee exclusion clause in Anchorage's insurance policy be construed as

applying both to actual and statutory employees of Anchorage.  Having resolved

this question of contract interpretation, we turn to the issue of whether Stephens

can establish that Mid-Continent had a duty under the policy to defend and

indemnify Anchorage in the state court proceeding.

9

### B. Summary Judgment

### 1. Duty to Defend

Under Florida law, an insurance provider's duty to defend an insured party "depends *solely* on the facts and legal theories alleged in the pleadings and claims against the insured." James River Ins. Co., 540 F.3d at 1275 (emphasis added) (internal quotation omitted). The duty to defend "arises when the relevant pleadings allege facts that 'fairly and potentially bring the suit within policy coverage.'" Lawyers Title Ins. Corp. v. JDC (Am.) Corp., 52 F.3d 1575, 1580 (11th Cir. 1995) (internal quotation omitted); see U.S. Fire Ins. Co. v. Hayden Bonded Storage Co., 930 So. 2d 686, 691 (Fla. 4th DCA 2006). "Thus, an insurer is obligated to defend a claim even if it is uncertain whether coverage exists under the policy." Mid-Continent Cas. Co. v. Am. Pride Bldg. Co., LLC, 601 F.3d 1143, 1149 (11th Cir. 2010) (quoting First Am. Title Ins. Co. v. Nat'l Union Fire Ins. Co., 695 So. 2d 475, 476 (Fla. 3d DCA 1997)). "[W]hen the actual facts are inconsistent with the allegations in the complaint, the allegations in the complaint control in determining the insurer's duty to defend." Jones v. Florida Ins. Guar. Ass'n, Inc., 908 So. 2d 435, 443 (Fla. 2005) (quoting Baron Oil Co. v. Nationwide Mut. Fire. Ins. Co., 470 So. 2d 810, 814 (Fla. 1st DCA 1985)).

Florida courts have found, however, that in special circumstances, a court may consider extrinsic facts if those facts are undisputed, and, had they been pled

10

in the complaint, they clearly would have placed the claims outside the scope of coverage.  See Nateman v. Hartford Cas. Ins. Co., 544 So. 2d 1026 (Fla. 3d DCA 1989); Nationwide Mut. Fire Ins. Co. v. Keen, 658 So. 2d 1101 (Fla. 4th DCA 1995).  As this Court has noted, however, such cases are best viewed "as exceptional cases in which courts have crafted an equitable remedy when it is manifestly obvious to all involved that the actual facts placed the claims outside the scope of coverage."  First Specialty Ins. Corp. v. 633 Partners, Ltd., 300 F. App'x 777, 786 (11th Cir. 2008).

   In the civil complaint filed in Florida state court, Stephens alleged that Anchorage was hired to supply and install a modular home on the Kirkland property, and that in the course of this project, Anchorage violated its general obligations to maintain the premises in a safe condition and to alert workers and employees of dangerous conditions.  Stephens alleged that Anchorage's gross negligence resulted in the death of Becker, who was employed at the time by Team Fritz, who was performing installation work.  There are no allegations in the complaint as to the employment relationship between Becker and Anchorage.  At first blush, the allegations in that complaint would seem to "fairly and potentially bring the suit within . . .  coverage" of Anchorage's insurance policy, which provides general coverage for personal injury claims against Anchorage.  Lawyers Title Ins. Corp., 52 F.3d at 1580.

11

The district court, however, discerned sufficient facts within the complaint itself to conclude that Anchorage had a contractor-subcontractor relationship with Team Fritz, and by extension a statutory relationship with Becker, thereby triggering the policy's employee exclusion clause, relieving Anchorage of the duty to defend.  The court observed that the complaint alleged that Anchorage "was hired to supply and install a modular home," and that Team Fritz *also* was "hired to install a modular home."  Stephens, 915 F. Supp. 2d at 1332.  These allegations, the court reasoned, suggested a subletting of Anchorage's duties to Fritz.  Id.  The district court also noted that the complaint included allegations that Anchorage failed to recognize the likelihood that an "employee" would be injured.  Id. at 1332–33.[1]

Unlike the district court, we doubt that these allegations in the state court complaint are sufficient in themselves to place the claims outside of policy coverage for purposes of the duty to defend.  But we need not resolve this question nor address the more difficult question of whether resort to extrinsic evidence might be appropriate in this case.  This is because the record evidence establishes that, regardless of whether there was a duty to defend, Mid-Continent had no duty to indemnify Anchorage for claims arising from Becker's death.

---

[1] Conceding that it "may perhaps seem abrupt to base the fate of this case on merely the use of the words 'install,' 'worker,' and 'employee,'" the district court observed that "there is a vast array of extrinsic evidence in the record supporting a lack of coverage as well."  Stephens, 915 F. Supp. 2d at 1333.

12

## 2.  Duty to Indemnify

Unlike the duty to defend, which generally is triggered by the allegations in the underlying complaint, an insurance company's duty to indemnify an insured party "is narrower and is determined by the underlying facts adduced at trial or developed through discovery during the litigation."  U.S. Fire Ins. Co. v. Hayden Bonded Storage Co., 930 So. 2d at 691; see also Hagen v. Aetna Cas. and Sur. Co., 675 So. 2d 963, 965 (Fla. 5th DCA 1996) ("Regardless of the allegations of the complaint, it is the underlying facts that determine the duty to indemnify.").  In other words, to determine whether there is a duty to indemnify, one looks at the actual facts, not only those that were alleged in the state court complaint.  And in order for a duty to indemnify to arise, the insurance policy must cover the relevant incident.

Mid-Continent's duty to indemnify Anchorage depends on whether Becker was Anchorage's statutory employee, and therefore turns on the actual relationship between Anchorage and Team Fritz – that is to say, whether Team Fritz was Anchorage's subcontractor.  Mid-Continent argues that Anchorage acted as a general contractor on the Kirkland project, and that Anchorage sublet part of its contractual obligation to Team Fritz.  Stephens maintains that the Kirklands never hired a general contractor – they acted as their own general contractor – and employed Anchorage merely as a subcontractor.  Under Stephens' theory,

13

Anchorage and Team Fritz were both subcontractors working side by side for the Kirklands, thereby precluding any statutory employment relationship between Anchorage and Team Fritz's employees.

After a careful review of the record, we conclude that the evidence clearly establishes that Anchorage served as the general contractor for the construction project, and that Anchorage had a contractor-subcontractor relationship with Team Fritz. Although Stephens calls our attention to points of factual dispute in the record, none of these disputes is material to the question of Anchorage's role in the project, or to its relationship with Team Fritz.

The parties agree that on August 13, 2007, Anchorage entered into a written contract, entitled an Owner/Contractor Agreement, with the Kirklands. The Agreement was set forth on Anchorage letterhead, on which the words "General Contractor CGC1504438" were printed at the top of the page. The Agreement provided that Anchorage would "furnish materials and perform all of the work shown on the construction documents" for the "system built home . . . along with site work and foundation." In exchange "for the material and labor to be performed under the contract," the Kirklands promised to pay Anchorage $343,800. This sum would be doled out in progress payments upon completion of various steps in the project. After an initial down payment, the Kirklands would pay Anchorage $45,000 upon completion of the foundation. After Anchorage

14

completed the delivery and set of the home, the Kirklands would pay Anchorage $160,000. The contract also provided for various payments upon completion of other steps, including plumbing, electrical work, and carpentry.

The Agreement granted Anchorage the right to engage subcontractors, who would be paid directly by Anchorage, to perform the contract work. Anchorage would, however, "in all instances remain responsible for the proper completion of the Contract." The Agreement also provided that Anchorage would "supervise and direct all the work." Under the Agreement, Anchorage was required to maintain a commercial general liability insurance policy and workers' compensation insurance.

There is no dispute that the Kirklands paid to Anchorage the deposit and the progress payments set forth in the Owner/Contractor Agreement. Anchorage accepted these payments and used the funds to pay the subcontractors on the project.

The parties also agree that Team Fritz was hired to set the modular home, a task that is expressly included as part of the contract work in the Owner/Contractor Agreement. Team Fritz's workers successfully set the modular home on the foundation, and Anchorage paid Team Fritz for this work. These payments were issued on Anchorage checks.

15

In addition to these undisputed facts, Mid-Continent points to a wide array of other evidence indicating that Anchorage served as the general contractor on the project and was in a vertical relationship with Team Fritz. For example, owner Jeffrey Kirkland testified that Anchorage was the general contractor, and that Anchorage hired and supervised the subcontractors, including Team Fritz. Mid-Continent also calls the court's attention to the deposition testimony of Jack Fritz, the owner of Team Fritz, who testified that the Kirklands had hired Anchorage, who in turn hired Fritz. Fritz also testified that William Liptak, Anchorage's owner, stopped by the construction site on a daily basis to check on the project's progress, and that Fritz contacted Liptak when issues arose on the project. Mid-Continent also notes that a sign reading "Anchorage Homes LLC – General Contractor" was posted on the Kirklands' property throughout construction.

In response, Stephens points to several items in the record which, she contends, raise factual questions about Anchorage's relationship to Team Fritz. Specifically, she argues that this evidence creates a dispute with respect to the following issues: (1) whether Anchorage and the Kirklands entered into a contemporaneous oral agreement modifying the terms of the Owner/Contractor Agreement; (2) whether a written contract existed between Anchorage and Team Fritz; (3) whether a building permit lists Anchorage as a subcontractor of the Kirklands, rather than a general contractor; and (4) whether the Kirklands hired or

16

were involved in hiring Team Fritz directly.  As discussed below, none of these issues raises genuine questions of material fact as to Anchorage's relationship with Fritz.

Stephens first argues that the Owner/Contractor Agreement, signed by Jeffrey Kirkland and Bill Liptak, did not reflect the true intent of the parties.  Instead, she contends, the Kirklands and Anchorage intended for Anchorage to serve merely as a subcontractor of the Kirklands.  She bases this argument on the deposition testimony of Bill Liptak, who testified that Anchorage declined to serve as general contractor on the project, and merely agreed to sell a modular home to the Kirklands and manage some administrative details "as a friend."

Taking this testimony at face value – *i.e.*, assuming that Liptak verbally committed to a more confined role on the Kirkland project – this fact is irrelevant to Anchorage's legal obligations under the Agreement.  Anchorage and Kirkland's legal relationship is defined by the unambiguous terms of the contract that they entered into on August 13, 2007.  "If the contract is clear and unambiguous, the legal construction of it follows, regardless of what construction may apparently have been placed upon it by the parties."  Solymar Invs., Ltd. v. Banco Santander S.A., 672 F.3d 981, 991 (11th Cir. 2012) (quoting Arnold v. First Sav. & Trust Co., 104 Fla. 545, 559, 141 So. 608, 608 (1932)).

17

The Agreement unambiguously sets forth Anchorage's obligations as general contractor on the project, providing that Anchorage would "supervise and direct all the work" and would "in all instances remain responsible for the proper completion of the contract."  Any evidence of a contemporaneous oral agreement modifying the Agreement's terms is irrelevant to Anchorage's legal obligations.  See Duval Motors Co. v. Rogers, 73 So. 3d 261, 265 (Fla. 1st DCA 2011); Bird Lakes Dev. v. Meruelo, 626 So. 2d 234, 237 (Fla. 3d DCA 1993) ("Under the parol evidence rule the terms of a valid written contract cannot be varied by a verbal agreement or other extrinsic evidence where the agreement was made before or at the time of the contract's execution.").

Second, Stephens raises the question of whether a written contract existed between Anchorage and Team Fritz.  Stephens cites the testimony of Jack Fritz, who stated that he had not entered a contract with Anchorage for the Kirkland project.[2]  But this evidence does little to further Stephens' case, as a written contract is not necessary to establish a contractor-subcontractor relationship.  See Orama v. Dunmire, 552 So. 2d 924, 925 (Fla. 1st DCA 1989); Reed v. Henry C. Beck Co., 510 So. 2d 613, 614 (Fla. 3d DCA 1987).  Here, the relationship was

_____

[2] In response, Mid-Continent points to other portions of Jack Fritz's testimony, where he reports that he worked for Anchorage, regardless of whether a formal contract was signed.  Mid-Continent also calls the Court's attention to a copy of a paid estimate for Team Fritz's work, sent by Fritz to Anchorage, which Anchorage once described to Mid-Continent as "the Fritz contract on the Kirkland installation with contract terms."  But this estimate does not resemble a formal contract.

18

established through the course of conduct by Anchorage and Team Fritz, and by the Owner/Contractor Agreement, in which Anchorage "assumed the legal position of general contractor for the job." Orama, 552 So. 2d at 925–26 (rejecting general contractor's argument that Section 440.10(1) did not apply because he did not enter into written contract with subcontractor). The evidence that there was no written contract therefore does not present a genuine issue of material fact as to the parties' relationship.

Third, Stephens cites evidence that Anchorage is identified as a subcontractor on a permit issued by the Monroe County Building Department. But it is unclear what import this evidence has, if any. The parties agree that the Kirklands applied for this permit in 2004, years before the Owner/Contractor Agreement was signed. The parties also agree that on August 9, 2007, Jeffrey Kirkland asked the county to add Anchorage to his existing building permit. In doing so, Kirkland used a form letter in which he identified himself as the owner of the property, but did not specify whether Anchorage was a contractor or subcontractor. And in later communications with the Monroe County Building Department, Anchorage held itself out as a general contractor, by using letterhead that referred to Anchorage as a general contractor and provided its general contractor license number. To the extent that Stephens cites the permit as evidence that the parties *represented* to the Monroe County Building Department that

19

Anchorage was a subcontractor, such an inference is not reasonably supported in the record.

Finally, Stephens asserts that there is a factual dispute as to whether the Kirklands selected and hired Team Fritz for the construction project. Stephens cites the deposition testimony of Bill Liptak, who testified that he had spoken with the Kirklands about Team Fritz coming on the project after the Kirklands encountered Jack Fritz setting a job down the street. According to Liptak, it was actually the Kirklands who hired Fritz.

Stephens argues that Liptak's testimony supports an inference that it was the Kirklands – not Anchorage – who entered into a contractor-subcontractor relationship with Fritz for the installation work. But such an inference is plainly contradicted by other, undisputed evidence: most importantly, the Owner/Contractor Agreement, which assigned to Anchorage sole responsibility for the supervision of subcontractors, their payment, and the completion of the work detailed in the Agreement, including the installation work. Under the Agreement, the Kirklands contracted away their rights to directly employ any subcontractors for the construction project. Stephens' theory also is in tension with the undisputed evidence that Anchorage was paid pursuant to the Owner/Contractor Agreement, and that Anchorage issued payments to Fritz for the installation work.

20

Stephens advocates for an inference that is not reasonable, as it cannot be reconciled with the undisputed evidence.

By contrast, Mid-Continent's theory – that Anchorage assumed the role of Fritz's employer, regardless of who did the hiring – is entirely consistent with the evidence in the record. Mid-Continent's theory does not contradict the Owner/Contractor Agreement, which authorized the Kirklands to contact subcontractors if they received the consent of Anchorage, and which provided that Anchorage retained sole responsibility for completion of the project work. And it is consistent with the general rule that an owner's contact with a subcontractor does not destroy the contractor-subcontractor relationship. See Lingold v. Transamerica Ins. Co., 416 So. 2d 1271, 1273 (Fla. 5th DCA 1982) (holding that firm that performed part of contractor's obligation under the main contract necessarily was a subcontractor to the main contractor, "notwithstanding that the owner [of the property] had some direct dealings" with the firm).

In sum, none of the evidence cited by Stephens raises a genuine question of material fact that bears on Anchorage's relationship with Team Fritz. To the contrary, there is overwhelming evidence establishing that Anchorage was the general contractor on the Kirkland project and was in a vertical contractor-subcontractor relationship with Team Fritz.

21

Because Anchorage was the statutory employer of Charles Becker, Team Fritz's employee, Anchorage was not entitled to indemnification under its general liability insurance policy for damages arising from Becker's death on the job. Stephens therefore cannot establish that Mid-Continent had a duty to indemnify Anchorage in the underlying suit, as required under Coblentz in order to enforce the settlement agreement against Mid-Continent. There are no genuine issues of material fact, and Mid-Continent is entitled to judgment as a matter of law.

In addition to appealing the district court's summary judgment decision, Stephens has appealed the district court's order awarding fees and costs to Mid-Continent. Stephens does not contest the amounts awarded to Mid-Continent, but merely contends "that the [o]rder awarding fees and costs should be vacated if this Court vacates the judgment in Mid-Continent's favor." Because we uphold the judgment entered below, we also affirm the district court's fee and cost order.

**AFFIRMED.**

JORDAN, Circuit Judge, concurring:

Given its summary judgment posture, this case is, for me, a close one. But for the reasons stated by Judge Friedman in his opinion for the court -- an opinion I join -- a reasonable jury could not have fairly found that Team Fritz was not one of Anchorage's subcontractors. In summary judgment parlance, the evidence presented by Ms. Stephens was a "mere scintilla," and did not create a genuine issue of material fact as to the relationship between Anchorage and Team Fritz. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Of great significance to me is the undisputed fact that Anchorage (and not the Kirklands) paid Team Fritz for its work in setting the modular home on the foundation. If Team Fritz was not one of Anchorage's subcontractors, Anchorage would have had no reason to pay Team Fritz.