**BOND SAFEGUARD INSURANCE COMPANY, Lexon Insurance Company, Plaintiffs–Appellants,**

v.

**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, Defendant–Appellee.**

No. 14–15233.

United States Court of Appeals, Eleventh Circuit.

Oct. 5, 2015.

Tucker Harrison Byrd, Scottie McPherson, Tucker H. Byrd & Associates, PA, Winter Park, FL, John H. Pelzer, Greenspoon Marder, PA, Fort Lauderdale, FL, Victor S. Kline, Greenspoon Marder, PA, Orlando, FL, for Plaintiffs–Appellants.

Steven J. Brodie, Carlton Fields Jorden Burt, PA, Miami, FL, Jon Michael Philipson, Sylvia H. Walbolt, Gwynne Alice Young, Carlton Fields Jorden Burt, PA, Tampa, FL, for Defendant–Appellee.

Before TJOFLAT and HULL, Circuit Judges, and BARTLE,[*] District Judge.

PER CURIAM:

In this diversity action, Plaintiffs–Appellants Bond Safeguard Insurance Company and Lexon Insurance Company (collectively, "Bond–Lexon") appeal the district court's grant of summary judgment in favor of Defendant–Appellee National Union Fire Insurance Company of Pittsburgh, PA ("National Union") on their declaratory judgment claim. After review and oral argument, we affirm.

## I. BACKGROUND

This appeal involves an insurance coverage dispute involving a Policy issued by National Union to Land Resource, LLC and its subsidiaries (collectively, "LRC" or "the insured LRC"). The issue is whether a contractual-liability exclusion in the Policy applies to a lawsuit brought by Bond–Lexon against the insured LRC and the subsequent judgment Bond–Lexon obtained against the insured LRC.

### A. The Policy

LRC and its subsidiaries were real estate development companies that contract-

---

[*] Honorable Harvey Bartle III, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

ed with municipalities to develop residential subdivisions in Georgia, Tennessee, and North Carolina. Robert Ward was LRC's chief executive officer and primary owner.

During the times relevant to this appeal, Ward and LRC had insurance coverage under a Directors, Officers, and Private Company Liability Insurance Policy (the "Policy") issued by National Union. Under the Policy, National Union agreed to provide coverage for the policy period of March 31, 2008, to March 31, 2009, as follows:

> This policy shall pay the Loss of each and every Director, Officer or Employee of the Company arising from a Claim first made against such Insureds during the Policy Period or the Discovery Period (if applicable) . . . for any actual or alleged Wrongful Act in their respective capacities as Directors, Officers or Employees of the Company.

National Union's Policy thus covered losses of LRC's Ward arising from claims made against him for any "wrongful acts" in his capacity as a director, officer, or employee of LRC.

As defined in the Policy, "Loss" includes damages, judgments, settlements, and defense costs, and a "Claim" means a civil "proceeding for monetary or non-monetary relief which is commenced by . . . service of a complaint or similar pleading." With respect to individual insureds such as Ward, the Policy defines "Wrongful Act" as "any breach of duty, neglect, error, misstatement, misleading statement, omission or act by such Insureds [Ward] in their respective capacities as such, or any matter claimed against such Insured [Ward] solely by reason of their status as directors, officers or Employees of the Company."

The Policy also contains various exclusions limiting National Union's coverage obligations. Relevant to this appeal, Exclusion 4(h) provides that National Union "shall not be liable to make any payment for Loss in connection with a Claim made against an Insured [Ward] . . . alleging, *arising out of,* based upon or attributable to *any* actual or alleged *contractual liability* of the Company or any other Insured *under any express contract or agreement* " (emphasis added).

## B. The Surety Bonds

As a developer, LRC arranged for the design and construction of subdivision improvements such as roads and utilities. The municipalities in which the subdivisions were located required LRC to obtain surety bonds to guarantee performance of LRC. LRC's failure to complete the improvements as required would constitute a breach of the development contracts with the municipalities.

Bond–Lexon, the plaintiff here, is in the business of issuing surety bonds, including subdivision bonds. Beginning in 2003, Bond–Lexon issued subdivision bonds on behalf of LRC as principal.[1] The bonds, which imposed obligations on Bond–Lexon as surety and LRC as principal, served to guarantee LRC's timely completion of the subdivision improvements. If LRC de-

---

1. As noted earlier, in this opinion we refer to LRC and its subsidiaries collectively as LRC. Bond–Lexon issued at least 45 bonds to LRC in relation to 6 residential subdivisions as follows: (1) 8 bonds for "Bridge Point at Jekyll Sound;" (2) 12 bonds for "The Villages of Norris Lake;" (3) 8 bonds for "Stillwater Coves;" (4) 8 bonds for "Grey Rock;" (5) 6 bonds for "Cumberland Harbour;" and (6) 3 bonds for "RiverSea Plantation." The surety bonds each name a different one of LRC's multiple subsidiaries as the principal on the bond. Thus, rather than naming the individual subsidiary principal on each bond, for brevity we refer to LRC as the principal.

faulted, the bonds required Bond–Lexon to complete the improvements or pay the municipalities the principal amounts of the bonds.

As a prerequisite to issuing any bonds, Bond–Lexon required Ward and LRC to execute a General Agreement of Indemnity ("GAI"). On August 12, 2003, Ward signed the GAI individually and on behalf of LRC. The GAI required Ward and LRC to "indemnify and save [Bond–Lexon] harmless from and against every claim, demand, liability, cost, charge, suit, judgment and expense which [Bond–Lexon] may pay or incur in consequence of having executed" the bonds. The GAI also gave Bond–Lexon the right to access Ward's and LRC's books, records, and accounts, and to request information from third parties concerning the performance of LRC's contracts.

By the summer of 2008, LRC had stopped making progress on the subdivision improvements covered by the bonds. In August and September 2008, Bond–Lexon received notices of default from the municipalities, informing it that LRC had defaulted on LRC's contractual agreements with the municipalities by failing to complete the improvements and developments. Bond–Lexon had bonded LRC's performance under the development contracts, so these notices of default demanded that Bond–Lexon fulfill its obligations under the bonds. Due to LRC's breaches of its contractual obligations, Bond–Lexon paid to settle the municipalities' claims on the bonds.

In October 2008, LRC filed a voluntary Chapter 11 bankruptcy petition, which was later converted to Chapter 7.

## C. Underlying Action and Settlement Agreement

On April 19, 2011, Bond–Lexon filed a two-count complaint in the U.S. District Court for the Middle District of Florida against Ward and other directors and officers of LRC, seeking damages suffered as a result of LRC's defaults on the projects covered by its development contracts. Bond–Lexon's initial complaint raised two causes of action based on (1) Ward's breach of his contractual duty to indemnify Bond–Lexon under the GAI, and (2) negligence by Ward and the other individual defendants.

After receipt of Bond–Lexon's initial complaint, Ward demanded coverage from National Union under the Policy. On July 14, 2011, National Union denied Ward's demand for coverage by virtue of Exclusion 4(h), maintaining that Bond–Lexon's claims arose out of LRC's and Ward's contract liability, and, therefore, fell into the exclusion.

Meanwhile, the parties (along with the bankruptcy trustee and others not relevant to the issue on appeal) negotiated a global settlement in LRC's bankruptcy proceeding. As part of this settlement, Bond–Lexon and Ward executed a *Coblentz* settlement agreement on November 7, 2012.[2] Under this agreement, Ward assigned to Bond–Lexon his rights to assert any claims against National Union with respect to the Policy and the coverage denials under the Policy. The parties agreed to the filing of a new amended complaint in the underlying action, abandoning Bond–Lexon's contractual indemnification claim against Ward and raising only its negligence claim against Ward. In the event

**2.** *Coblentz v. Am. Sur. Co. of N.Y.,* 416 F.2d 1059, 1062–63 (5th Cir.1969) (holding that if a liability insurer is informed of an action against its insured but declines to defend the insured, the insurer may be held to a consent judgment entered in that action, absent fraud or collusion).

National Union declined to defend in Bond–Lexon's lawsuit against Ward, Ward stipulated to a $40,410,729 judgment in favor of Bond–Lexon. In return, Bond–Lexon agreed not to seek to collect this judgment from Ward.

On December 12, 2012, Bond–Lexon filed its second amended complaint, raising one count of negligence against Ward. Bond–Lexon's second amended complaint stated: "[t]his case arises from the defaults of various bond principals on subdivision bonds ... that [Bond–Lexon] issued on behalf of Land Resource, LLC." Bond–Lexon alleged that Ward was negligent in managing the design and construction of the subdivision improvements as well as LRC's financial resources. Due to Ward's allegedly negligent acts and omissions, LRC did not complete the subdivision improvements and defaulted on its obligations bonded by Bond–Lexon.

In addition, Bond–Lexon's second amended complaint alleged that Ward failed to fully and accurately disclose LRC's financial condition, including severe cash flow problems beginning in 2005 that impacted LRC's ability to fund the cost of completing the improvements. These negligent misrepresentations allegedly induced Bond–Lexon to issue the subdivision bonds and to forego equitable remedies such as exoneration or *quia timet.* Bond–Lexon's second amended complaint also alleged that, as a result of Ward's negligence from 2005 through 2009, Bond–Lexon suffered at least $40,410,729 in "losses as the result of the [bonds] issued and/or claims received in connection with the [subdivisions]."

Ward demanded coverage from National Union for the damages alleged in Bond–Lexon's second amended complaint. In a letter dated January 22, 2013, National Union denied Ward's demand for coverage based on Exclusion 4(h) of the Policy. On January 29, 2013, the district court entered a stipulated final judgment for Bond–Lexon against Ward in the amount of $40,410,729, as agreed to in the *Coblentz* agreement. The judgment reflected the losses incurred by Bond–Lexon as of November 5, 2012, including payments on the bonds, unpaid bond premiums, loss adjustment expenses, and attorney's fees.

## D. Insurance Coverage Dispute with National Union

Bond–Lexon, as Ward's assignee, then sued National Union in Florida state court for breach of the Policy. Bond–Lexon's complaint sought a declaratory judgment that Bond–Lexon was entitled to full coverage under the Policy and that the *Coblentz* agreement was reasonable and made in good faith. Bond–Lexon contended that National Union was obligated to pay the judgment amount of $40,410,729.

On April 8, 2013, National Union removed the action to the U.S. District Court for the Middle District of Florida on the basis of diversity of citizenship. The parties cross-moved for summary judgment.

On October 20, 2014, the district court granted National Union's motion for summary judgment. The district court concluded that this phrase in Exclusion 4(h)— "arising out of, based upon or attributable to any ... contractual liability"—was unambiguously broad so as to preclude coverage for tort claims that depended on the existence of the insured's contractual liability under any express contract or agreement. The district court found that Bond–Lexon's claim depended on—and was not merely incidental to—the contractual liability of Ward and LRC under the GAI, the bonds, and various development contracts. Because Exclusion 4(h) precluded coverage in the underlying action, the district court did not decide whether the *Cob-*

*lentz* agreement was reasonable or made in good faith.[3]

Final judgment was entered in favor of National Union on October 21, 2014. Bond–Lexon timely appealed.

## II. STANDARD OF REVIEW

We review *de novo* the district court's grant of summary judgment, viewing all facts in the light most favorable to the non-moving party. *Morales v. Zenith Ins. Co.*, 714 F.3d 1220, 1226 (11th Cir.2013). Summary judgment is appropriate only when there exists no genuine factual dispute and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). The district court's interpretation of insurance policy language is also subject to *de novo* review. *Hegel v. First Liberty Ins. Corp.*, 778 F.3d 1214, 1219 (11th Cir. 2015).

## III. DISCUSSION

In this diversity action, the parties agree that Florida substantive law governs the determination of the issues on appeal. *See State Farm Fire & Cas. Co. v. Steinberg*, 393 F.3d 1226, 1230 (11th Cir.2004).

Bond–Lexon seeks to recover from National Union the $40,410,729 judgment entered against Ward pursuant to the *Coblentz* agreement. To recover, Bond–Lexon must show that (1) National Union wrongfully refused to defend Ward in the underlying action brought by Bond–Lexon against Ward, (2) National Union had a duty under the Policy to indemnify Ward for the $40,410,729 judgment, and (3) the settlement between Bond–Lexon and Ward was reasonable and made in good faith. *See Stephens v. Mid–Continent Cas. Co.*, 749 F.3d 1318, 1322 (11th Cir.

2014); *Perera v. U.S. Fid. & Guar. Co.*, 35 So.3d 893, 900 (Fla.2010).

In contrast to the duty to defend, the insurer's duty to indemnify is determined by the actual facts of the underlying case rather than only the facts and legal theories alleged in the complaint. *See Stephens*, 749 F.3d at 1324. And the duty to indemnify arises only when the Policy covers the relevant claim against the insured Ward. *See id.* The parties' primary dispute on appeal is whether Exclusion 4(h) precludes coverage for Bond–Lexon's lawsuit resulting in the $40,410,729 judgment against Ward. We begin by setting forth the relevant Florida law.

### A. Florida Legal Standards

Under Florida law, "the language of the policy is the most important factor" in interpreting insurance contracts. *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So.2d 528, 537 (Fla.2005). "[I]nsurance contracts are construed according to their plain meaning," and any ambiguities must be construed in favor of the insured. *Id.* at 532. However, to allow for such a construction, the provision must actually be ambiguous—that is, "susceptible to more than one reasonable interpretation, one providing coverage and the [other] limiting coverage." *Id.* (alteration in original) (internal quotation marks omitted). Exclusionary provisions that are clear and unambiguous must be enforced according to their terms, and "courts may not rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties." *Id.* (internal quotation marks omitted).

Although no Florida court has interpreted the precise language of the exclusion at

---

**3.** Nevertheless, the district court noted that, even if the Policy did provide coverage, entry of judgment for National Union "would likely still be warranted" based on record evidence indicating that enforcement of the *Coblentz* agreement would be contrary to Florida law.

issue, the Florida Supreme Court has provided some guidance on the meaning of "arising out of" in the context of insurance policy exclusions. In *Taurus Holdings,* the Florida Supreme Court held that the term "arising out of" is unambiguous and "broader in meaning than the term 'caused by.'" *Id.* at 539 (internal quotation marks omitted). Accordingly, the term should be interpreted broadly to encompass all of the following: "originating from, having its origin in, growing out of, flowing from, incident to, *or having a connection with.*" *Id.* (emphasis added) (internal quotation marks omitted). The Florida Supreme Court explained that while "arising out of" requires "some causal connection, or relationship" that is "more than a mere coincidence," proximate cause is not required. *Id.* at 539–40 (internal quotation marks omitted).

## B. Exclusion 4(h) Applies

According to Bond–Lexon, Ward's negligent misrepresentations induced Bond–Lexon to issue the subdivision bonds and to rely on the GAI as adequate security. Bond–Lexon argues that its claim for fraudulent inducement sounded wholly in tort and not contract, and arose out of Ward's misrepresentations that necessarily predated the bonds, rather than any subsequent contractual liability of Ward or LRC. Bond–Lexon therefore contends that coverage was not barred by Exclusion 4(h) in Ward's Policy. We disagree.

The premise of Bond–Lexon's claim is that Ward is liable for the losses and expenses Bond–Lexon incurred in settling the municipalities' claims on its bonds because it was Ward's negligence that caused LRC and Ward to default on LRC's contractual obligations to the municipalities in 2008. According to the second amended complaint, Ward's alleged negligence included hiring incompetent architects to design the improvements, improperly supervising retained professionals and contractors, failing to budget for the payment of architectural services, and concealing LRC's increasingly dire financial situation. This alleged negligence primarily occurred during the course of LRC's performance under the development contracts with the municipalities. Thus, Bond–Lexon's argument on appeal—that its claim rested solely on Ward's negligent misrepresentations made *before* any bonds were issued in 2003—is belied by its own second amended complaint as well as the record.

Alternatively even if some of the acts predated the issuance of some of the later surety bonds, Exclusion 4(h) of the Policy excludes coverage for any "Loss in connection with a Claim ... alleging, *arising out of,* based upon or attributable to *any* actual or alleged *contractual liability*" of the insured "under any express contract or agreement" (emphasis added). LRC's failure to complete the subdivision improvements, in breach of the development contracts, triggered Bond–Lexon's duty to pay the municipalities under the bonds. But for LRC's failure to perform its contractual obligations to the municipalities (bonded by Bond–Lexon) and Ward's refusal to indemnify Bond–Lexon pursuant to the GAI, Bond–Lexon would not have incurred the damages sought in Bond–Lexon's underlying action against Ward. In other words, Bond–Lexon's claim depended on the existence of contractual liability of some kind.

Bond–Lexon's pleading of its claim in tort does not alter the fact that all of its asserted losses arose from the Ward's and LRC's contractual breaches of the development contracts and the GAI. The plain language of Exclusion 4(h) does not limit its applicability to loss in connection with only contract claims. Given the Florida Supreme Court's broad interpretation of

the unambiguous phase "arising out of," we find a sufficient causal connection between Bond–Lexon's purported negligence claim and the contractual liability of Ward and LRC to enforce the exclusion according to its terms. *See id.; see also Transamerica Ins. Co. v. Snell,* 627 So.2d 1275, 1276 (Fla.Dist.Ct.App.1993) (policy exclusion barring coverage for "[a]ny claim *arising out of* insolvency" applied to negligence claim because plaintiff's "asserted loss [was] ultimately predicated" on an excluded insolvency (emphasis added)).[4] Stated another way, under the particulars of this case, the alleged negligence and misrepresentations, which form the basis of the tort claim, had a clear nexus with the development contracts, and the tort claim is inextricably intertwined with the circumstances surrounding the development contracts, plus the resolution of the tort claim requires consideration of the losses and duties under the development contracts. *See Jackson v. Shakespeare Found., Inc.,* 108 So.3d 587, 594 (Fla.2013).

Because Exclusion 4(h) clearly applied to Bond–Lexon's claim against Ward, National Union had no duty to indemnify Ward for the value of his settlement with Bond–Lexon. In light of this holding, we need not and do not decide whether the *Coblentz* settlement was reasonable and made in good faith.

## IV.   CONCLUSION

For the foregoing reasons, we affirm the district court's order granting summary judgment to National Union.

**AFFIRMED.**

---

4.   "As this is a diversity case, in the absence of a controlling decision from the Florida Supreme Court, we are obligated to follow decisions from the Florida intermediate appellate courts unless there is some persuasive indication that the Supreme Court would decide the case differently." *Raie v. Cheminova, Inc.,* 336 F.3d 1278, 1280 (11th Cir.2003).