[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-11181
_____

D.C. Docket No. 6:15-cv-00718-CEM-DCI


HEALTH FIRST, INC.,
HOLMES REGIONAL MEDICAL CENTER, INC.,
CAPE CANAVERAL HOSPITAL, INC.,
HEALTH FIRST PHYSICIANS, INC.,
HEALTH FIRST HEALTH PLANS, INC.,
HEALTH FIRST INSURANCE, INC.,

                                                        Plaintiffs - Appellants,

versus

CAPITOL SPECIALTY INSURANCE CORP.,
DARWIN NATIONAL ASSURANCE COMPANY,
DARWIN SELECT INSURANCE COMPANY,
EXECUTIVE RISK INDEMNITY, INC.,
EXECUTIVE RISK SPECIALTY INSURANCE CO.,

                                                        Defendants - Appellees.
_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(August 22, 2018)

Before MARTIN, JULIE CARNES, and GILMAN,[*] Circuit Judges.

MARTIN, Circuit Judge:

Health First, Inc. appeals the District Court's grant of summary judgment to its insurers in this insurance-coverage case. Health First brought suit seeking indemnification for costs it incurred defending and settling several lawsuits relating to its allegedly anticompetitive behavior. All of Health First's relevant insurance policies have "related claims" provisions, deeming all claims "related logically, causally or in any other way" to arise whenever the first related claim was made. Health First submitted the first two lawsuits for coverage under its insurance policies, and its insurer paid, exhausting Health First's coverage for those years. Now, its insurers say that all the later lawsuits are related to those first claims, and as a result, they are not covered by Health First's more recent insurance policies. The District Court agreed. After careful review, and with the benefit of oral argument, we affirm.

## I.  BACKGROUND

A. THE FACTS

Health First is a healthcare company based in Florida. It was formed in 1995 upon the merger of Holmes Regional Medical Center and Cape Canaveral Hospital,

---

[*] Honorable Ronald Lee Gilman, United States Circuit Judge for the Sixth Circuit, sitting by designation.

both located in Brevard County, Florida.  Today, Health First includes four

hospitals, a physician group, and a network of managed health plans.

### 1.  The Insurance Policies

At all relevant times, Health First had insurance policies that indemnified

against loss from wrongful acts.  The insurers at issue here are Executive Risk

Indemnity, Inc. and Executive Risk Specialty Insurance Co. (the Executive Risk

Defendants), as well as Capitol Specialty Insurance Corp., Darwin National

Assurance Co., and Darwin Select Insurance Co. (the Allied World Defendants).

Each of the relevant policies in this case is a "claims-made" policy, meaning

coverage is triggered at the time a claim is made rather than at the time the

challenged activity occurred.  Each policy also has a "related claims" provision.  In

general, these provisions state that "All Related Claims, whenever made, shall be

deemed to be a single Claim and shall be deemed to have been first made"

whenever the earliest related claim was made.  "Related Claims" is further defined

as

> all Claims for Wrongful Acts based on, arising out of, directly or indirectly
> resulting from, in consequence of, or in any way involving the same or
> related facts, circumstances, situations, transactions or events or the same or
> related series of facts, circumstances, situations, transactions or events,
> whether related logically, causally or in any other way.

### 2.  The Lawsuits

Since 1998, Health First has been the defendant in a number of lawsuits

3

alleging it engaged in various forms of anticompetitive behavior.  In February 1998, Wuesthoff Health Systems sued Health First in federal court in Florida, alleging that Health First was engaging in anticompetitive behavior ("Wuesthoff I"). Wuesthoff claimed Health First was using its regional market dominance to coerce health insurers and physicians to stop working with Wuesthoff.  Health First allegedly forced physicians to refer patients to Health First facilities in order to retain their staff privileges.  If physicians did not comply, Health First "would arrange for new physician practice groups to open competing practices and undercut the fees charged" in order to drive uncooperative physician groups out of business.

In 1999, Wuesthoff voluntarily dismissed its claims and refiled similar claims in state court ("Wuesthoff II").  In this state-court action, Wuesthoff said Health First was a monopolist, controlling the vast majority of the market for acute-care hospital inpatient services in South Brevard County.  This forced all health-management plans and physician groups operating in South Brevard County to work with Health First.  But some competition still existed in Central Brevard County, where Wuesthoff was located.  Wuesthoff said Health First forced managed-care plans that wanted access to its hospitals in South Brevard County to also cover care offered at its hospital in Central Brevard County, where Wuesthoff was located—behavior Wuesthoff alleged to be "unlawful tying."  Wuesthoff also

4

said Health First made managed-care plans exclude coverage at Wuesthoff facilities in order to qualify for discounts.  The parties settled this action in December 2000.

In September 2005, Wuesthoff filed another lawsuit, again alleging that Health First had engaged in anticompetitive behavior ("Wuesthoff III").  Wuesthoff claimed Health First's managed-care plans referred patients exclusively to Health First facilities, and that independent plans were placed at a competitive disadvantage. New to this complaint, Wuesthoff said Health First had initiated an unsuccessful regulatory challenge to Wuesthoff's expansion into South Brevard County, and then attempted to expand its own operations into Central Brevard County, where Wuesthoff was based, in an attempt to directly target Wuesthoff.  In addition, Wuesthoff claimed Health First had purchased many physician-practice groups in Central Brevard County that agreed to admit patients exclusively to Health First facilities.  In May 2007, Wuesthoff voluntarily dismissed its federal case and refiled in state court ("Wuesthoff IV").  The parties settled this action in November 2012.

Also in May 2007, Dr. Richard Hynes and his employer, the B.A.C.K. Center, filed a class-action suit against Health First, likewise alleging anticompetitive behavior ("Hynes").  Hynes alleged that Health First rewarded providers who referred patients exclusively to Health First facilities and punished providers who did not.  Specifically, Hynes said that he and the B.A.C.K. Center

had been excluded from coverage under the Health First plan, that the Health First plan refused to collect bills previously owed to B.A.C.K., and that the Health First plan refused to sell health coverage to B.A.C.K. employees because B.A.C.K. was also using Wuesthoff facilities.  Notably, Hynes and Wuesthoff IV were consolidated for all pretrial purposes.  While Wuesthoff IV had settled, some of the claims in Hynes were still pending when Health First filed this action.

In September 2013, OMNI Healthcare, the Interventional Spine Institute of Florida, and individual medical providers sued Health First for anticompetitive behavior ("OMNI").  OMNI is a multi-specialty group practice located in South Brevard County that admitted patients to both Health First and Wuesthoff facilities. OMNI said it was denied referrals from Health First affiliates and lost hospital privileges at Health First hospitals for failing to admit patients exclusively to Health First hospitals.  The OMNI suit was still pending when Health First filed this action.

Health First submitted Wuesthoff I and II for coverage under its 1997 and 1998 insurance policies with Executive Risk.  Executive Risk accepted coverage and paid out those claims, leaving no outstanding requests for coverage relating to Wuesthoff I and II.  Health First later submitted Wuesthoff III, IV, Hynes, and OMNI to its insurers for indemnification.  The Executive Risk Defendants accepted coverage for Wuesthoff III, IV, and Hynes.  But because Executive Risk concluded the later suits were related to Wuesthoff I and II, it offered coverage only under

6

Health First's 1997 and 1998 policies. Executive Risk paid out the limits on those policies to Health First, but refused to pay under any later policies. The Allied World Defendants denied coverage for all the lawsuits, saying they were all related to Wuesthoff I and II, and therefore predated Health First's coverage with Allied World.

## B. PROCEDURAL HISTORY

In March 2015, Health First filed suit against its insurers in Florida state court. Health First sought declaratory relief and damages for its insurers' failure to provide indemnification for the Wuesthoff III, IV, Hynes, and OMNI cases under its later insurance policies.[1] The insurers removed to federal court.

The Executive Risk Defendants and the Allied World Defendants moved for summary judgment, arguing that all the claims were related to Wuesthoff I and II. As a result, they said the more recent lawsuits were not covered by their more recent policies. Both defendants later filed alternative motions for summary judgment. In these motions, the defendants argued that at the very least Wuesthoff III, IV, Hynes, and OMNI were all related to each other, meaning they all related back to the time Wuesthoff III was filed.

Health First opposed the motions for summary judgment, arguing in part that

---

[1] Health First had policies with the Executive Risk Defendants when the Wuesthoff I, II, III, IV, and Hynes lawsuits were filed. Health First had policies with the Allied World Defendants when Wuesthoff III, IV, Hynes, and OMNI were filed.

7

a related-claims determination must be based on the facts underlying previous lawsuits, not just on the complaints.  Health First contended summary judgment was improper because the insurers had "not presented the Court with any evidence of the actual facts involved in those actions."

The District Court granted the insurers' original motions for summary judgment.  The court rejected Health First's argument that the court could not consider the similarity of the allegations in the various complaints, writing that "[c]ourts do not require a showing of the actual facts to determine whether multiple claims are related.  Rather courts often focus on and compare the underlying allegations to determine if multiple claims are related under an insurance policy's related claims provision."  The court looked to the text of the related-claims provisions, the factual allegations in each complaint, and statements Health First had made in the Wuesthoff III litigation that that case merely repeated the allegations of Wuesthoff I and II.  The court determined that all the lawsuits described conduct from a "common scheme" that Health First had undertaken "with the overarching goal of furthering their own success, dominating the South and Central Brevard County healthcare markets, eliminating competition, and establishing a monopoly in the healthcare service industry."  Because all the lawsuits related back to Wuesthoff I and II, the court found they were not covered by the later policies at issue.

8

This appeal followed.

## II.  DISCUSSION

We review <u>de novo</u> the District Court's ruling on summary judgment.  <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1190 (11th Cir. 2002).

On appeal, Health First makes two primary arguments.  First, that the District Court erred as a matter of law in granting summary judgment for the insurers based only on allegations in the underlying complaints.  And second, that even considering only the complaints, the District Court erred in granting summary judgment for the insurers and finding that all claims were related.

Summary judgment may be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Once the movant, here, the defendant, satisfies its initial burden under Rule 56(c) of demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmovant to come forward with specific facts showing that there is a genuine issue for trial."  <u>Allen v. Tyson Foods, Inc.</u>, 121 F.3d 642, 646 (11th Cir. 1997) (quotation marks omitted).  In other words, once the insurers put forward evidence that Health First could not prove it was entitled to coverage under the later policies, it was Health First's burden to show that some dispute of material fact remained that prevented the court from ruling in the insurers' favor.

A. WHETHER THE DISTRICT COURT ERRED IN RELYING SOLELY ON
   THE COMPLAINTS AS EVIDENCE OF RELATEDNESS

Now, Health First argues that the District Court erred because it "improperly relied exclusively on the allegations of the Underlying Complaints in making a determination of the Insurers' duty to indemnify Health First." Instead, Health First says "[t]he district court was obligated to rule based on the actual facts underlying the legal claims made in the Underlying Lawsuits and was precluded, as a matter of Florida law, from looking solely to the allegations made in the pleadings to determine whether the multiple insurance claims at issue are related."

Health First seeks coverage in this case based on its insurers' duty to indemnify. "Unlike the duty to defend, which generally is triggered by the allegations in the underlying complaint, an insurance company's duty to indemnify an insured party is narrower and is determined by the underlying facts adduced at trial or developed through discovery during the litigation." Stephens v. Mid-Continent Cas. Co., 749 F.3d 1318, 1324 (11th Cir. 2014) (quotation marks omitted). In other words, because the duty to defend arises as soon as a relevant claim is made, that duty "depends solely on the facts and legal theories alleged in the pleadings." Id. at 1323 (quotation marks omitted). The duty to indemnify, on the other hand, is based on "the actual facts, not only those that were alleged in the state court complaint." Id. at 1324. These principles are blackletter law.

10

The duty to defend is a broader duty for an insurer than is the duty to indemnify.   See id. (describing the duty to indemnify as "narrower" than the duty to defend); Jones v. Fla. Ins. Guar. Ass'n, 908 So. 2d 435, 443 (Fla. 2005) ("The duty to defend is of greater breadth than the insurer's duty to indemnify, and the insurer must defend even if the allegations in the complaint are factually incorrect or meritless."); U.S. Fire Ins. Co. v. Hayden Bonded Storage Co., 930 So. 2d 686, 691 (Fla. 4th DCA 2006) ("It is clear that an insurer's duty to defend is broader than its duty to indemnify. . . .  Because the duty to defend is so broad and so important to an insured, its existence is determined early on based on only the allegations of the complaint.").  This typically means that, at the summary-judgment stage, showing an absence of the duty to defend is tougher for an insurer, not easier, than showing an absence of the duty to indemnify.

Because the duty to defend is broader than the duty to indemnify, the Florida courts have recognized that a duty to indemnify cannot exist if there is no duty to defend.  See, e.g., WellCare of Fla., Inc. v. Am. Int'l Specialty Lines Ins. Co., 16 So. 3d 904, 906 (Fla. 2d DCA 2009) ("We first address whether [the insurer] had a duty to defend because the duty to indemnify is narrower than the duty to defend and thus cannot exist if there is no duty to defend."); accord Wilshire Ins. Co. v. Poinciana Grocer, Inc., 151 So. 3d 55, 57 (Fla. 5th DCA 2014) (Orfinger, J., concurring) ("As the duty to defend is broader than the duty to indemnify, if a

11

court determines that there is no duty to defend, as a matter of law, there cannot be a duty to indemnify."). This makes sense because an insurer has a duty to defend against a claim only if there is at least a possibility that the claim is covered by the insurance policy. If it is clear from the outset there is no coverage under the policy, then the insurer has neither a duty to defend nor a duty to indemnify.

The Florida courts have therefore dismissed claims for indemnification upon finding no duty to defend. See, e.g., Mid-Continent Cas. Co. v. Royal Crain, LLC, 169 So. 3d 174, 184 (Fla. 4th DCA 2015) ("The eight corners of the complaint and the policy do not provide a basis for the Insurer's duty to defend. Because the accident arose from a claim excluded from coverage under the policy, the Insurer has no duty of indemnification."); Essex Ins. Co. v. Big Top of Tampa, Inc., 53 So. 3d 1220, 1224 (Fla. 2d DCA 2011) ("Because Essex has no duty to defend Big Top . . . , Essex has no corresponding duty to indemnify."); Acosta, Inc. v. Nat'l Union Fire Ins. Co., 39 So. 3d 565, 574–76, 578 (Fla. 1st DCA 2010) (affirming a determination at summary judgment that the insurer owed no duty to indemnify based on the complaints alone, and stating that "whether extrinsic evidence should be considered" in assessing the duty to indemnify "is a matter to be decided on a case-by-case basis"); WellCare, 16 So. 3d at 907 ("Having concluded that AISLIC had no duty to defend, we likewise conclude that it had no duty to indemnify WellCare for the sums [that WellCare] paid to settle the [underlying] action."). So

although the duty to indemnify depends on the underlying facts of the case, the duty-to-defend test can be used to assess whether the underlying facts could possibly give rise to a duty to indemnify.  A determination that there is no duty to defend, in other words, is also a determination that there is no duty to indemnify.

In short, even though the duty to indemnify depends on the actual facts of the case, there is no rule against relying solely on the complaint to determine whether there is any set of facts that could possibly give rise to coverage.  Because the complaints in Wuesthoff III, Wuesthoff IV, Hynes, and OMNI revealed no set of facts under which coverage would be available—that is, no set of facts that could both support the claims in those complaints and be unrelated to the claims in Wuesthoff I and Wuesthoff II—the district court did not err in applying the duty-to-defend test in order to determine whether there was a duty to indemnify.

Critical to our decision is that Health First has not pointed, either in the District Court or on appeal, to any extrinsic evidence showing that the allegations made in the complaints were actually unrelated.  At no point in the District Court or before this Court has Health First presented any affidavits or other evidence hinting at a genuine dispute of material fact.  And as pointed out at oral argument, Health First was the defendant in all the relevant actions, many of which had already settled.  As a result, Health First was better positioned than any of the insurers to present evidence from those underlying cases to strengthen its position, but it chose

not to do so.  The defendant insurers put forward their own evidence that all the claims were related, including the underlying complaints and statements made by Health First in the underlying actions that spoke to their relatedness.  Health First was welcome to "come forward with specific facts showing that there [was] a genuine issue for trial," but it did not do so.  See Allen, 121 F.3d at 646 (quotation marks omitted).  Accordingly, the District Court did not err in resolving the insurers' motions for summary judgment based on the only evidence of relatedness that was put before it.

B.  WHETHER THE COMPLAINTS SHOW A GENUINE DISPUTE OF MATERIAL FACT TO PRECLUDE SUMMARY JUDGMENT

Next, Health First argues that even considering only the underlying complaints, the underlying claims were not related.  We look first to the text of the insurance policies.  "Florida courts have said again and again that 'insurance contracts must be construed in accordance with the plain language of the policy.'"  Sphinx Int'l, Inc. v. Nat'l Union Fire Ins. Co., 412 F.3d 1224, 1227 (11th Cir. 2005) (quoting Swire Pac. Holdings, Inc. v. Zurich Ins. Co., 845 So. 2d 161, 165 (Fla. 2003)).  The related-claims provisions at issue in this case are extremely broad.  Health First's policies group claims "in any way involving the same or related facts," and "whether related logically, causally or in any other way."  The inclusion of "in any way" in both of these phrases suggest they could reach conduct with a somewhat attenuated connection.  See Vozzcom, Inc. v. Great

14

Am. Ins. Co. of N.Y., 666 F. Supp. 2d 1332, 1340 (S.D. Fla. 2009) (reading similar language to "require[] only a tenuous connection" between claims).

In the end, Health First is stuck with the policies it paid for. These policies have extremely broad related-claims provisions. In this case, all of the underlying complaints describe a continuing pattern of anticompetitive behavior on the part of Health First. To name just one similarity, all the complaints allege that Health First used its monopolistic power to coerce doctors to admit patients exclusively to Health First facilities. This Court and the Florida courts have applied related-claims provisions with much narrower language to bar claims relating to a pattern or practice of behavior. See, e.g., Cont'l Cas. Co. v. Wendt, 205 F.3d 1258 (11th Cir. 2000) (per curiam) (finding "different types of acts . . . aimed at a single particular goal . . . [that] resulted in a number of different harms to different persons" to be related claims); Gidney v. Axis Surplus Ins. Co., 140 So. 3d 609, 614–15 (3d Fla. DCA 2014) (finding separate actions relating to negligent brokering and servicing of mortgages "based on the same course of conduct by the insured" to be related claims). Health First's half-hearted attempts to distinguish the underlying lawsuits based on the identity of the plaintiffs or time at which they were filed do not change the fact that all the lawsuits describe a continuing pattern of the same or similar bad behavior. The District Court therefore did not err in finding that all the underlying claims were related under the extremely broad

15

related-claims clauses in Health First's insurance policies.

**AFFIRMED.**